Telecommunications Resellers
Association, et al.,
Intervenors.

Nos. 99–1535 & 00–1090.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 30, 2000.
Decided Jan. 23, 2001.

**AT&T CORPORATION, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

730

Gene C. Schaerr argued the cause for petitioner AT&T Corporation and supporting intervenor WorldCom, Inc. With him on the briefs were James P. Young, Mark C. Rosenblum, Peter H. Jacoby, Judy Sel-

lo, Thomas F. O'Neil, III, William Single, IV, and Jeffrey A. Rackow.

William T. Lake argued the cause for petitioner U.S. WEST Communications, Inc. On the briefs were Dan L. Poole, Robert B. McKenna, John H. Harwood, II, and William R. Richardson, Jr.

John E. Ingle, Deputy Associate General Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were Christopher J. Wright, General Counsel, and Laurel R. Bergold, Counsel. Robert B. Nicholson and Robert J. Wiggers, Attorneys, United States Department of Justice, entered appearances.

Mark C. Rosenblum, Peter H. Jacoby, Judy Sello, Gene C. Schaerr, James P. Young, Thomas F. O'Neil, III, William Single, IV, and Jeffrey A. Rackow were on the brief for intervenors AT&T Corporation and WorldCom, Inc.

Before: EDWARDS, Chief Judge, SENTELLE and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Chief Judge EDWARDS.

HARRY T. EDWARDS, Chief Judge:

█ US WEST* petitioned the Federal Communications Commission ("FCC" or "Commission"), pursuant to § 10 of the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 (1996), for forbearance from "dominant carrier" regulation in the provision of high capacity special access and dedicated transport for switched access services ("high capacity services") in the Phoenix and Seattle Metropolitan Statistical Areas ("MSAs"). *See* Petition of U.S. WEST Communications, Inc. for Forbearance from Regulation as a Dominant Carrier in the Phoenix, Arizona MSA, et al., 14 F.C.C.R. 19,947 (1999) (hereinafter "Forbearance Order"). In

---

* At the request of petitioner in 00–1090, the caption was amended to read: "Qwest Corporation v. Federal Communications Commission and United States of America".

Although US West merged into Qwest Corporation, this court's opinion refers to petitioner as "US West".

seeking forbearance, U.S. WEST relied heavily on evidence regarding its market share. The Commission found, however, that U.S. WEST failed to provide the underlying raw data on which its conclusions were based, and, as a result, U.S. WEST's findings were not verifiable. The Commission thus reasonably rejected U.S. WEST's market share evidence.

US WEST argues that the Forbearance Order should nevertheless be overturned, because the Commission failed to consider evidence of supply elasticity and demand elasticity. In response to U.S. WEST's claim, the Commission held that market share data is critical to a *"prima facie* showing of competition." *Id.* ¶ 33, at 19,-967. In other words, because U.S. WEST offered no reliable data on market share, the Commission determined that the petition for forbearance failed to make a *prima facie* showing that sufficient competition existed to satisfy the requirements of § 10. The problem with this position, however, is that the FCC's conclusion is inconsistent with its earlier decisions on this issue. In the past, the FCC has considered market share along with other factors such as supply elasticity, demand elasticity and comparative advantages in cost structure, size and resources. The FCC has even made a non-dominance determination in the absence of any market share data, never suggesting that market share data is essential for a *prima facie* showing of competition. This case must therefore be remanded for further consideration by the agency.

AT&T and WorldCom, in separate petitions for review, argue that the Forbearance Order should be vacated to the extent that it grants U.S. WEST forbearance under the Pricing Flexibility Order. *See In re* Access Charge Reform, 14 F.C.C.R. 14,221 (1999) (hereinafter "Pricing Flexibility Order"). In ¶ 2 of the Forbearance Order, the Commission stated that "we grant the relief requested in the forbearance petitions to the extent that the Pricing Flexibility Order establishes a framework pursuant to which the BOC petitioners may obtain relief by

demonstrating satisfaction of the competitive triggers adopted in that order." Forbearance Order, 14 F.C.C.R. ¶ 2, at 19,949. At the conclusion of the Order, however, the Commission explained that "the Pricing Flexibility Order establishes a mechanism by which the petitioners may receive much of the relief they seek without having to demonstrate loss of market power." *Id.* ¶ 36, at 19,968. The FCC therefore "encourage[d] the BOC petitioners to submit [their] petitions for any market, including the markets identified in ... their forbearance petitions, as soon as they have sufficient information to satisfy the required competitive triggers." *Id.* AT&T and WorldCom claim that, in referring U.S. WEST to the Pricing Flexibility Order, the FCC effectively granted relief on a petition that was found meritless under § 10. This is a specious claim. It is clear that, the Forbearance Order does nothing more than indicate that U.S. WEST is eligible to apply for relief under the Pricing Flexibility Order; no concrete relief was granted to U.S. WEST in the Forbearance Order.

During argument before this court, counsel for the FCC suggested that the mere availability of relief under the Pricing Flexibility Order was itself sufficient to forestall a claim under § 10. We reject this position. US WEST and other such petitioners are entitled to pursue forbearance under § 10 without regard to the Pricing Flexibility Order. In other words, § 10 remains a viable and independent avenue of appeal for pricing flexibility. Therefore, the FCC's rejection of the U.S. WEST petition for forbearance does not survive review because of the availability of the Pricing Flexibility Order.

## I. BACKGROUND

US WEST petitioned the Commission to forbear from regulating it as a dominant carrier in high capacity services in the Phoenix and Seattle MSAs. Petition of U.S. WEST Communications, Inc. for For-

bearance from Regulation as a Dominant Carrier in the Phoenix, Arizona MSA, CC Docket No. 98–157 (filed August 24, 1998) (hereinafter "Phoenix Pet."), at 1; Petition of U S WEST Communications, Inc. for Forbearance from Regulation as a Dominant Carrier for High Capacity Services in the Seattle, Washington MSA, CC Docket No. 99–1 (filed Dec. 30, 1998) (hereinafter "Seattle Pet."), at iii. SBC Companies, Bell Atlantic Telephone Companies, and Ameritech Operating Companies ("BOC petitioners") also filed forbearance petitions seeking pricing flexibility in other markets throughout the United States. Forbearance Order, 14 F.C.C.R. ¶ 1, at 19,947–48. In seeking forbearance, U.S. WEST requested permissive de-tariffing, which would permit the filing of tariffs on one day's notice with a presumption of lawfulness and without cost support, exemption from price cap and rate of return regulation, and permission to charge deaveraged rates. Phoenix Pet. at 8–9; Seattle Pet. at 8–9.

US WEST's petition for forbearance rested on § 10 of the Telecommunications Act of 1996. Under § 10, the Commission will forbear from applying any regulation or any provision of the Act to a telecommunications carrier or telecommunications service, or class of telecommunications carrier or telecommunications services, in any or some of its geographic markets, if the Commission determines that (1) enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable, and are not unjustly or unreasonably discriminatory; (2) enforcement of such regulation or provision is not necessary for the protection of consumers; and (3) forbearance from applying such provision or regulation is consistent with the public interest. 47 U.S.C. § 160(a) (1998).

In its petitions, U.S. WEST argued that the high capacity markets in the Phoenix and Seattle MSAs were robustly competitive, and, as a result, U.S. WEST did not have market power in those areas. US WEST based its claims primarily on reports prepared by Quality Strategies, POWER Engineers ("PEI"), and economists Alfred E. Kahn and Timothy J. Tardiff. Kahn and Tardiff based their economic evaluation on the reports prepared by Quality Strategies and PEI, in addition to their own research. In describing its diminished market power, U.S. WEST addressed several factors, including (1) market participants, (2) market share, (3) demand elasticity of customers, (4) supply elasticity of customers, and (5) the carrier's cost, structure, size, and resources. Phoenix Pet. at 14; Seattle Pet. at 14. What follows is a brief review the evidence offered by U.S. WEST.

First, regarding market participants, U.S. WEST claimed that, in the Phoenix MSA, it faced competition from resellers and five facilities-based competitors. US WEST emphasized that the merger of Teleport Communications Group, one of its competitors, with AT&T ("AT&T/TCG"), and the pending merger of MCI with another of its competitors, MFS WorldCom ("MCI/MFS WorldCom"), further contributed to robust competition. Phoenix Pet. at 2–3. In the Seattle MSA, U.S. WEST claimed to face competition from resellers and three facilities-based competitors, AT&T/TCG, Electric Lightwave Inc., and MCI/MFS WorldCom. Seattle Pet. at 14–15.

Second, in reference to market share, U.S. WEST emphasized that, based on the market analysis conducted by Quality Strategies, competitors have captured more than 70% of the retail market for high capacity services in the Phoenix MSA. Phoenix Pet. at 19. In addition, competitors in the Phoenix M.S.A. § have captured significant portions of the growth in demand in the provider segment, i.e., high capacity services ultimately purchased by end users, and in the transport segment, i.e., high capacity services purchased by carriers for transport. Id. at 21. In the Seattle MSA, U.S. WEST presented mar-

ket analysis by Quality Strategies showing that competitors have almost 80% of the retail market for high capacity services. Seattle Pet. at 19. Moreover, competitors have captured about two-thirds of the growth in demand for high capacity services. *Id.* at iv.

Third, in demonstrating high demand elasticity, U.S. WEST pointed out that, in the Phoenix MSA, customers for high capacity services are sophisticated businesses, some of which could migrate high capacity traffic to their own affiliated fiber networks. Phoenix Pet. at 23–25. US WEST emphasized that evidence showing that competitors hold significant portions of market share in the retail segment, and increasing portions of market share in the provider and transport segments of the market, further indicates demand elasticity. *Id.* at 25. Similarly, in the Seattle MSA, customers tend to be sophisticated businesses and governmental entities that are highly sensitive to price. Seattle Pet. at 24. In addition, as in the Phoenix MSA, U.S. WEST's largest carrier customers in the Seattle MSA are able to migrate high capacity traffic to their own affiliated fiber networks. *Id.* at 25. Furthermore, Kahn and Tardiff explain that competitors' high market share in the retail segment of the Seattle market, and the rapid growth of competitors' market share in the provider and transport segments of the market, reinforces demand elasticity. *Id.* at 25.

Fourth, in relation to supply elasticity in the Phoenix MSA, U.S. WEST explained that, based on Quality Strategies' market reports, competitors have more than adequate excess capacity to constrain U.S. WEST's pricing determinations. Phoenix Pet. at 26. US WEST's five main facilities-based competitors in the Phoenix M.S.A. § have put in place over 800 route miles of optical fiber. In the Phoenix MSA, competitors' fiber backbone networks would be able to assume U.S. WEST's end-use and transport traffic utilizing less than 8% capacity. *Id.* at 26. Based on the PEI study of the Phoenix MSA, U.S. WEST explained that if competitors invest $45 million, they could

serve almost 50% of U.S. WEST's high capacity customer locations within 1,000 feet of their current fiber networks. *Id.* at 27. Kahn and Tardiff pointed out that economies of scale and opportunities to bundle services make the investment to revenue comparison more favorable to competitors in the Phoenix, MSA. *Id.* at 28–29. US WEST emphasized that the growth of competitors' market share in the Phoenix M.S.A. § demonstrates that the cost of entry is not prohibitive. *Id.* at 30.

Similarly, in the Seattle MSA, competitors have in place more than 700 route miles of optical fiber, with the capacity to service all of U.S. WEST's end user and transport traffic. Seattle Pet. at 26. An estimated 61% of U.S. WEST's high capacity demand is located within 100 feet of competitors' networks. *Id.* at iv. As a result, competitors could absorb U.S. WEST's services relatively quickly. Based on PEI's report, the cost to competitors of extending their fiber networks to take over most of U.S. WEST's high capacity demand would not be prohibitive. If competitors invest $46 million, they will be able to serve the almost 60% of U.S. WEST's high capacity customer locations within 1,000 feet of their existing fiber networks. *Id.* at 27. The significant growth of competitors' market share demonstrates that the cost of entry is not prohibitive. As in the Phoenix MSA, Kahn and Tardiff emphasized that economies of scale and opportunities to bundle services make the investment to revenue ratio more favorable for potential competitors in the Seattle MSA. *Id.* at 28–29.

Fifth, U.S. WEST asserted that it did not have an advantage over its competitors in terms of relative size. In the Phoenix MSA, U.S. WEST faces five facilities-based competitors, and the merged competitors AT&T/TCG and MCI/MFS WorldCom have significant advantages in terms of economies of scale and access to capital. Phoenix Pet. at 31. Kahn and Tardiff explain that the fact that competition in the market in the Phoenix M.S.A. § has

increased, while prices for services have decreased, strongly indicates that investors believe incumbents do not have absolute cost advantages in the market. *Id.* at 32.

Similarly, in the Seattle MSA, U.S. WEST does not benefit from comparative advantage in terms of costs, structure, size, and resources. As in the Phoenix MSA, AT&T/TCG and MCI/MFS have advantages based on size; furthermore, increase in competitive entry into the market, despite the fact that U.S. WEST's charges for high capacity services have declined, strongly indicates that U.S. WEST does not have an insurmountable cost advantage. Seattle Pet. at 31–32.

The Commission received numerous comments arguing that U.S. WEST remained dominant in the markets for high capacity services in the Phoenix and Seattle MSAs, including comments criticizing Quality Strategies' market reports. For-bearance Order, 14 F.C.C.R. ¶ 25, at 19,-961 n. 88. The Commission denied U.S. WEST's request for forbearance, finding U.S. WEST's basis for evidence regarding market share, the market analysis conducted by Quality Strategies, could not be verified and, therefore, was not reliable. *Id.* ¶ ¶ 25–26, at 19,961–62. Furthermore, the market share data was based on DS1 equivalents, which distorted the level of competition. Finally, the Commission rejected the market share analysis, because U.S. WEST focused on retail market share and, therefore, failed to account for the fact that even when U.S. WEST did not provide retail services, U.S. WEST still provided and received compensation for the underlying facilities. Without Quality Strategies' underlying evidence of market share, the Commission found that U.S. WEST had failed to make a *prima facie* showing of competition and, therefore, did not satisfy the initial requirement for § 10 forbearance. *Id.* ¶ 33, at 19,967.

The Commission, however, completely failed to address the evidence other than the market share data offered by U.S. WEST to show its diminished market pow-er—*i.e.,* evidence relating to market participants, demand elasticity of customers, supply elasticity of customers, and the carrier's cost, structure, size, and resources. It is this failing that is the focus of U.S. WEST's petition for review.

## II. DISCUSSION

### A. Standard of review

■ We review the Commission's order pursuant to familiar Administrative Procedure Act standards, to determine whether it is arbitrary, capricious, an abuse of discretion, or not in accordance with law. 5 U.S.C. § 706(2)(A) (1994). As the Supreme Court explained in *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983):

The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.,* supra, at 285, 95 S.Ct. 438; *Citizens to Preserve Overton Park v. Volpe, supra,* at 416, 91 S.Ct. 814. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The re-

viewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given. *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575 (1947). *Id.* at 43, 103 S.Ct. 2856. In addition, the Court has made it clear that when an agency determines to change an existing regulatory regime it must do so on the basis of "reasoned analysis." *Id.* at 42, 103 S.Ct. 2856.

### B. Commission's Denial of Forbearance

The Commission determined that it was not required to forbear from treating U.S. WEST as a dominant carrier solely because of three major areas of weakness in U.S. WEST's evidence regarding market share. The Commission's principal concern appeared to be that the studies conducted by Quality Strategies analyzing U.S. WEST's market share were not reliable. US WEST did not provide the underlying raw data on which the studies were based. As a result, the analysis could not be evaluated or verified. The Commission noted, for example, that Quality Strategies failed to provide a copy of the questions and answers that were the basis of its surveys, and failed to describe how it weighted and evaluated responses to the surveys. *Forbearance Order*, 14 F.C.C.R. ¶ 25, at 19,961. Without adequate information about Quality Strategies' methods, the Commission found that it was unable to resolve discrepancies between their market share evidence and evidence presented by other commentators. *Id.* ¶ 26, at 19,962.

The Commission also faulted the material prepared by Quality Strategies insofar as it purported to measure market share by analyzing the percentage of capacity provided by various providers of high capacity services. A "DS1" is a measure of capacity, and Quality Strategies used DS1 equivalents to measure market share. The problem, however, as the FCC pointed out, is that reliance on DS1 equivalents fails to provide an accurate measure of competition for high capacity services, because resort to this data overstates competitive inroads in a market. One DS3 channel is equivalent to 28 DS1 channels. Therefore, if entity "x" provides one DS3 channel to one customer, and entity "y" provides 28 DS1 channels to 28 different customers, entity "y" can claim that it has only 50% of the market share based on "capacity." *Id.* ¶ 27, at 19,963. Because of this type of distortion, the Commission rejected the claim that the DS1 equivalents methodology provides an accurate measure of market share. The Commission also found that DS1 equivalents methodology puts disproportionate weight on entrance facilities, which are usually DS3 circuits. *Id.* ¶ 28, at 19,964.

Finally, the Commission found that U.S. WEST's evidence regarding market share further distorts levels of competition by relying on retail market share. By defining competitive losses based on retail, U.S. WEST can claim competitive losses even when U.S. WEST provides the underlying facilities and, therefore, continues to benefit from a substantial revenue stream from the services. *Id.* ¶ 29, at 19,965. For example, the Commission noted that U.S. WEST claimed to have lost 70% of the Phoenix retail market for special access and high capacity dedicated transport services. But, according to its own calculations, U.S. WEST maintained control over 77% of the overall Phoenix market for special access and high capacity dedicated transport. *Id.* US WEST argues that the FCC considered only market share and failed to analyze other bases of market power, including evidence regarding supply elasticity, demand elasticity, and the comparative resources of U.S. WEST and its competitors. They are right on this point. The FCC's order rests *solely* on a view that, because U.S. WEST offered no reliable data on market share, the petition for forbearance failed to make a *prima facie* showing that sufficient competition existed to satisfy the requirements of § 10. Insofar as there may be other reasons to reject U.S. West's petition, such as the

purported deficiencies in U.S. West's elasticity arguments outlined in the FCC's brief, they were not articulated in the FCC's order and, therefore, cannot provide the basis for upholding the FCC's decision. *See Burlington Truck Lines v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) ("the courts may not accept appellate counsel's *post hoc* rationalizations for agency action; *Chenery* requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself" (*citing SEC v. Chenery,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947))).

■ Were this the first time the FCC was asked to consider whether a carrier was dominant in a given market, the explanation provided by the Commission in the Forbearance Order may well have been adequate; but it is not the first time that the Commission has addressed this issue. Indeed, the FCC has considered this question on several occasions, each time applying a test different from that applied here to determine whether the firm in question retained market power. For instance, in the *Motion of AT&T Corp. to be Reclassified as a Non–Dominant Carrier,* 11 F.C.C.R. 3,271 (1995) the FCC considered four factors: (1) "AT&T's market share"; (2) "the supply elasticity of the market"; (3) "the demand elasticity of AT&T's customers"; and (4) "AT&T's cost structure, size and resources." *Id.* ¶ 38, at 3,293–94. This approach was also followed in subsequent proceedings before the agency. *See Motion of AT&T Corp. to be Declared Non–Dominant for International Service,* 11 F.C.C.R. ¶ 36 at 17,977 (1996) ("*AT&T International Nondominance Order*"); *COMSAT Corp., Petition Pursuant to Section 10(c) of the Communications Act of 1934, as amended, for Forbearance from Dominant Carrier Regulation and for Reclassification as a Non–Dominant Carrier,* 13 F.C.C.R. ¶ 67, at 14,118–19 (1998) ("*COMSAT Nondominance Order*"). Yet, in evaluating U.S. West's petition, the FCC ended its inquiry once it deemed the market share data inadequate.

Logically, for the lack of market share data to establish the lack of a *prima facie* case, market share must be an *essential* factor, not merely one of several factors in the determination. Our research indicates, however, that the FCC has never viewed market share as an *essential* factor in the past, and the Commission does not assert to the contrary. In fact, the FCC acknowledges that "the factors the Commission traditionally considered in classifying carriers as dominant or non-dominant include market share, supply substitutability, elasticity of demand, and the cost structure, size and resources of the carrier." FCC Br. at 4. Therefore, the FCC's conclusion in the Forbearance Order that market share data is essential for a *prima facie* showing of competition simply is not consistent with the agency's earlier decisions.

It is also noteworthy that, in the past, the FCC has gone so far as to view market share as irrelevant where there was other evidence that a carrier lacked market power. In the COMSAT Nondominance Order, for example, the FCC made a nondominance finding without "specific data" on the market shares of the carrier in question or its competitors. *COMSAT Nondominance Order,* 13 F.C.C.R. ¶ 111, at 14,-139.

It may be that it is reasonable for the Commission to demand a showing on market share in every dominance inquiry. But, no matter how reasonable it may be for the FCC to require market share data before evaluating an incumbent local exchange carrier's market power, it is not reasonable for the Commission to announce such a policy without providing a satisfactory explanation for embarking on this course when it has not followed such a policy in the past. The FCC "cannot silently depart from previous policies or ignore precedent" as it has done here. *Committee for Community Access v. FCC,* 737 F.2d 74, 77 (D.C.Cir.1984) (*citing Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970) ("an

agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored")). No matter how reasonable the FCC's position that market share data is necessary for a *prima facie* showing of market competition, the FCC's "conclusory statements cannot substitute for the reasoned explanation that is wanting in this decision." *ARCO Oil & Gas Co. v. FERC*, 932 F.2d 1501, 1504 (D.C.Cir.1991).

Accordingly, the FCC's *Forbearance Order* must be remanded so that the Commission may "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Manufacturers Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856. The FCC departed from its traditional non-dominance analysis without explanation. The FCC's new policy that market share data is essential to evaluate a carrier's market power may well be reasonable, but until the Commission has adequately explained the basis for this conclusion, it has not discharged its statutory obligation under the Administrative Procedure Act. Where, as here, an agency "has failed ... to explain the path that it has taken, we have no choice but to remand for a reasoned explanation." *Tex Tin Corp. v. EPA*, 935 F.2d 1321, 1324 (D.C.Cir.1991).

C. Alleged Grant of Forbearance Under the Pricing Flexibility Order

In the Forbearance Order, the Commission stated that "we grant the relief requested in the forbearance petitions to the extent that the Pricing Flexibility Order establishes a framework pursuant to which the BOC petitioners may obtain relief by demonstrating satisfaction of the competitive triggers adopted in that order." Forbearance Order, 14 F.C.C.R. ¶ 2, at 19,949. AT&T and WorldCom argue that the Forbearance Order should be vacated to the extent that the Commission "granted" "relief" to U.S. WEST, because U.S. WEST's petition was found to be meritless under § 10. This argument borders on being disingenuous.

When the Forbearance Order is read in its entirely, it is absolutely clear that U.S. WEST was granted no relief whatsoever. US WEST sought forbearance and it was categorically denied. At the conclusion of the Order, the Commission reminded U.S. WEST and other BOCs that they were eligible to apply for pricing flexibility under the Pricing Flexibility Order:

The BOC petitioners may file petitions with the Commission in accordance with the procedures outlined in the *Pricing Flexibility Order* for any market, including the markets identified in their forbearance petitions, identifying the relief requested and demonstrating satisfaction of the triggers adopted therein.

*Id.* ¶ 2, at 19,949. Indeed, the FCC was quite candid in suggesting that the Pricing Flexibility Order might be the preferred mechanism for companies seeking relief from the burdens of dominant carrier status, because "price cap LECs are not required to demonstrate that they lack market power in the provision of any access service to receive much, if not all, of the pricing flexibility that the BOC petitioners seek in their forbearance requests." *Id.* ¶ 11, at 19,953. The Forbearance Order does not, however, ensure U.S. WEST any kind of entitlement to the regulatory relief available under either § 10 of the Act or the recently promulgated Pricing Flexibility Order. Accordingly, the claims from AT&T and WorldCom are specious.

D. Impact of Pricing Flexibility Order on § 10 Forbearance

■ During oral argument, it became clear that there is some confusion over the relationship between the mechanisms for relief afforded by § 10 forbearance and the Pricing Flexibility Order. FCC counsel went so far as to suggest that the latter preempts the former. We reject this view.

There is no doubt that the Commission expressed great enthusiasm over the availability of the Pricing Flexibility Order as a mechanism for relief of the sort sought here by U.S. WEST and other BOCs. In-

deed, the Commission suggested that might be a better mechanism for affected companies, because

> non-dominance showings [under § 10] are neither administratively simple nor easily verifiable. The Commission [bases] non-dominance findings on complex criteria, including market share and supply elasticity. Market share analyses require considerable time and expense, and they generate controversy that is difficult to resolve.

*Id.* ¶ 11, at 19,953. The Commission may or may not be right in what it surmises about the purported advantages of the Pricing Flexibility Order; but, at least for now, these surmises are beside the point. Congress has established § 10 as a viable and independent means of seeking forbearance. The Commission has no authority to sweep it away by mere reference to another, very different, regulatory mechanism.

Section 10 broadly states that the Commission will forbear from applying any regulation or any provision of the Act to a telecommunications carrier or telecommunications service, or class of telecommunications carrier or telecommunications services if certain statutory determinations are made. 47 U.S.C. § 160. The Pricing Flexibility Order does not purport to regulate pursuant to § 10—it is narrower in reach and adopts different burdens of proof with respect to issues that might be common to claims arising under § 10 or the Pricing Flexibility Order. And, notably, in the Forbearance Order, the Commission did not claim that the Pricing Flexibility Order would afford all of the relief otherwise available to a petitioner under § 10; rather, the Commission said only that "the Pricing Flexibility Order establishes a mechanism by which the petitioners *may* receive *much* [not all] of the relief they seek" under § 10. 14 F.C.C.R. ¶ 36, at 19,968.

In short, the availability of the Pricing Flexibility Order as an alternative route for seeking pricing flexibility does not diminish the Commission's responsibility to fully consider petitions under § 10.

Therefore, the Commission is without authority to deny U.S. WEST's petition for forbearance because of the availability of the Pricing Flexibility Order.

### III. Conclusion

For the foregoing reasons, U.S. WEST's petition for review is granted and the case is remanded for further consideration by the agency. The petition for review filed by AT&T and WorldCom is hereby denied.