# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 5, 2014          Decided October 31, 2014

No. 13-1220

VERIZON AND AT&T, INC.,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

———

On Petition for Review of an Order of
the Federal Communications Commission

———

*Helgi C. Walker* argued the cause for petitioners. With her on the briefs were *Gary L. Phillips*, *Bennett L. Ross*, *Brett A. Shumate*, *Michael E. Glover*, and *Christopher M. Miller*. *Christopher M. Heimann* entered an appearance.

*Richard K. Welch*, Deputy Associate General Counsel, Federal Communications Commission, argued the cause for respondents.  With him on the brief were *William J. Baer*, Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson*  and *Nickolai G. Levin*, Attorneys, *Jonathan B. Sallet*, General Counsel, Federal Communications Commission, *Jacob M. Lewis*, Associate General Counsel, and *Laurel R. Bergold*, Counsel.

Before: TATEL and BROWN, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge*: Petitioners Verizon and AT&T appeal the FCC's denial of their petition to forbear from applying the requirement that incumbent price cap carriers maintain a Uniform System of Accounts. The Commission insists that the statutory preconditions for section 10 forbearance are not met, nor was its refusal arbitrary and capricious. We agree that the FCC's interpretation and application of section 10 are permissible and deny the petition for review.

**I.**

Congress has required the FCC to establish rules prescribing a Uniform System of Accounts for use by telephone companies since 1935. Earlier rules were designed to facilitate rate determinations in the traditional monopoly model: expenses were aggregated and classified not by the particular activities or services, but rather according to the organization that incurred them. PETER W. HUBER ET AL., FEDERAL TELECOMMUNICATIONS LAW § 2.2.2.9. (2d ed. 2014). The FCC collected company-wide financial and operating data in a world where a monopolized industry provided only two basic services – local and long distance. The Commission adopted a new accounting system in 1986 – Part 32 – to respond to the introduction of competition and new services. The FCC made clear that Part 32 obligations were imposed *only* on incumbent local exchange carriers (those that operated exclusively within their local service area prior to the 1996 Act). Petitioners AT&T and Verizon are incumbent LECs subject to price cap regulation.

(Price cap regulation governs a broader class of carriers than just incumbent LECs even though Part 32 applies only to incumbent LECs). The FCC classifies incumbent LECs as "dominant" on the basis of market power (encompassing market share and control of network facilities), which in most markets in the nineties, "amounted to a distinction between AT&T and everyone else." *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 221 (1994).

This "new" Uniform System of Accounts was designed to complement the then-existing rate structure governing incumbent LECs, rate of return regulation. LECs reported their costs to establish a rate base and the Commission set prices that allowed LECs to earn a formulated rate of return. This way if a LEC spent money on, for example, a new operating plant, it had a right to charge enough to recover those expenditures. Part 32 was integral to this regime because it allowed the FCC to determine the costs of specific services; the accounting rules are specifically tailored to the telecommunications industry and require carriers to maintain 170 cost and revenue accounts setting forth disaggregate and geographically-specific data. The Commission relied upon the detailed cost data reflected in Part 32 accounts to set rates on the basis of cost estimates (derived from past costs).

Although Part 32 incorporated certain elements of GAAP, the two accounting systems are considerably different in terms of both content and purpose. Part 32 is tailored for disclosure to regulators, whereas GAAP is geared towards disclosure to investors. GAAP provides for much more flexibility than Part 32 because it is a set of accounting principles, concepts, and standards (as opposed to detailed cost accounting rules) pursuant to which a company can determine its *own* system of accounts, which will necessarily vary from carrier to carrier.

The data underlying Part 32 was also used by incumbent LECs to comply with rules requiring that they divide their costs and revenues in a specified manner. For example, Part 64's cost assignment rules require that carriers directly assign or allocate their investments, expenses, and revenues between regulated and non-regulated activities. Part 36 then requires carriers to separate regulated investment, expenses, and revenues between the interstate and intrastate jurisdictions. Incumbent LECs also submitted raw Part 32 data in the form of Automated Reporting Management Information System (MIS) Reports that they were required to file annually.[1]

In the early 1990s, the Commission abandoned rate of return regulation, recognizing that a too-high rate of return could prompt perverse incentives and induce inefficiencies. The Commission adopted price cap regulation in its place. Under the new regime, the Commission sets a maximum price and the firm selects rates at or below the cap. *Nat'l Rural Telecom Ass'n v. F.C.C.*, 988 F.2d 174, 178 (D.C. Cir. 1993).

The rate-setting framework requires carriers to file tariffs that establish the rates, terms, and conditions of interstate services. Interstate access rates are the most commonly-filed tariff, and the FCC is charged with ensuring these rates are just and reasonable.[2] The tariff filing scheme is "the heart of the common-carrier section of the Communications Act" and is symbiotic with price cap regulation: in switching to price cap, the FCC modified the tariff review process to set a ceiling on the

---

[1] The parties refer to this with a peculiar acronym, ARMIS, which sounds like a Defense Department system. We will use the shorter well-known acronym MIS – Management Information Systems – understanding that they are automated.

[2] Interstate access rates are for services that provide LECs with access to local networks at the originating or terminating ends of a long-distance call.

interstate access rates LECs can charge. *MCI Telecomms. Corp.*, 512 U.S. at 229.

Interstate access rates are set for different groups of service categories known as baskets. When a LEC files interstate access rates that are at or below a basket's price cap *and* within specified pricing bands for service categories in that basket, the FCC presumes such rates are reasonable and reviews the tariff pursuant to "streamlined" procedures. *LEC Price Cap Order*, 5 FCC Rcd 6786, 6788 ¶ 11 (1990). Such rates generally will become effective without suspension and investigation under section 204. But rates filed above the cap or price band have a strong likelihood of suspension, and they will be subjected to a more searching review. Once the tariff is suspended and set for investigation, the FCC dispenses with the presumption of reasonableness and the burden is imposed on the carrier to show its rates are just and reasonable. In addition, the FCC may challenge and investigate a carrier's rates at any time upon its own initiative or receipt of a complaint, and if it finds that a tariff is unlawful, the FCC may prescribe a new rate. Finally, any party may submit a section 208 complaint challenging even presumptively reasonable price cap rates.

The shift from rate-of-return to price cap regulation undoubtedly obviated *some* of the need to maintain detailed cost accounts because the Commission no longer sets rates based primarily on costs. The extent to which Part 32 remains relevant is the essential issue before us.

To further the deregulatory aims underlying the 1996 overhaul of the Communications Act, Congress provided the FCC with the unusual authority to forbear from enforcing provisions of the Act as well as its own regulations. *See* 47 U.S.C. § 160. Section 10(a) provides that the Commission *shall* forbear from applying any provision or rule "to a telecommunications carrier or telecommunications service, or

class [thereof]" if the Commission finds that: (1) enforcement is not necessary to ensure that charges and practices are just, reasonable and non-discriminatory, (2) enforcement "is not necessary for the protection of consumers," and (3) forbearance "is consistent with the public interest." Then, fleshing out the concept of "public interest," the Act states in section 10(b) that in evaluating the public interest "the Commission shall consider whether forbearance from enforcing the provision or regulation will promote competitive market conditions" – and if the Commission determines that such forbearance will promote competition among providers of telecommunications services that determination shall be a basis for a Commission finding that forbearance is in the public interest.

Section 10(c) provides that any carrier may submit a petition for forbearance. Such a request "shall be deemed granted" unless the Commission denies the petition for failure to meet section 10(a)'s three conditions within one year (subject to a ninety-day extension) of receiving the request. The three conditions of § 10(a) are conjunctive and the Commission can "properly deny a petition for forbearance if it finds that any one of the three prongs is unsatisfied." *See Cellular Telecomms. & Internet Ass'n v. F.C.C.*, 330 F.3d 502, 509 (D.C. Cir. 2003). It should be apparent, however, that there is a great deal of overlap in the three factors. Factor number one seems to focus on other customers and factor two on the broad consumer population. But it is hard to imagine any action that would enhance competition satisfying the public interest that actually would not also satisfy the first two factors. On the other hand, it might be that a proposed forbearance that would not injure competition among providers could still somehow be prejudicial to consumers.

Petitioners Verizon and AT&T have long argued that, in light of the existing price cap regime, the Commission's accounting rules are unnecessary and have used the vehicle of

section 10 to chip away at specific accounting rules. In a trilogy of 2008 orders, the FCC granted incumbent LECs' petitions for forbearance from cost assignment rules and certain MIS Reports. The Commission's first Order granting AT&T forbearance from cost assignment rules (and associated MIS reporting requirements) was conditioned on, *inter alia*, requiring AT&T to retain and provide Part 32 data upon request, implement a method of preserving the integrity, for both costs and revenues, of its accounting system, and submit a detailed compliance plan. In the second Order, the Commission provided forbearance from MIS service quality and infrastructure filing requirements to AT&T, Verizon and Qwest, and extended the same conditional forbearance from cost assignment rules (previously granted to AT&T) to Verizon and Qwest. Finally, in the third Order, the Commission granted forbearance to Qwest, AT&T and Verizon from filing certain financial-themed MIS Reports on the condition that the carriers continue to file certain pole attachment data publicly with the Commission. In sum, the Commission's grants of forbearance were conditioned upon the continued application of Part 32 to Verizon, AT&T, and Qwest in all three Orders, and its decisions to dispense with filing requirements did not affect the obligation to maintain the underlying Part 32 data.

This brings us to the instant petition. USTelecom sought relief from a myriad of statutory and rule provisions, including application of the entire Part 32 to all *incumbent* price cap carriers.[3] USTelecom also made two separate requests for partial forbearance for *all* price cap carriers from (1) specific Part 32 rules containing property record requirements and (2) cost assignment rules (which had already been granted to AT&T, Verizon, and Qwest). USTelecom and petitioners

---

[3]USTelecom is petitioners' trade association and represents incumbent LECs. Verizon Br. at 9.

argued Part 32 no longer serves any current federal need when applied to incumbent, price cap LECs. And, they claimed, the burden and expense associated with keeping two sets of regulatory and financial accounting books actually distorts an increasingly competitive marketplace for telecommunication services; the costs of Part 32 compliance are imposed solely on incumbent LECs. In the weeks preceding the already-extended deadline when the petition would be deemed granted, USTelecom filed a number of *ex parte* submissions, two of which set forth proposed terms for what they called "voluntary commitments" or "conditions for" forbearance.[4] Although the parties use the terms "partial" and "conditional" interchangeably, these are two distinct types of forbearance; partial forbearance is a request for the FCC to forbear from applying a subset of a group of regulations, whereas conditional forbearance is a request for across-the-board forbearance subject to enumerated conditions.

The Commission granted partial, conditional, or complete forbearance from 126 of 141 challenged rules. The FCC did not, however, grant the global request to forbear from applying Part 32 to incumbent price cap carriers because it found that USTelecom had failed to carry its burden of proof on each of the three prongs of section 10. *USTelecom Order*, 28 FCC Rcd 7627, 7630 ¶ 2 (2013). Verizon and AT&T petition for review of the *USTelecom Order.*

---

[4]The April 18 *ex parte* letter offered that incumbent price cap carriers would (1) continue filing pole attachment information and develop methods to replicate necessary pole attachment data for filing purposes, (2) commit to track transactions subject to section 272(e)(3), and the May 3 *ex parte* letter added that the carriers would (3) limit increases to the cost input to the FCC pole attachment rate formulae for three years, and (4) retain the ability to provide financial data depicting existing Part 32 account structures for five years.

**II.**

Petitioners insist that the switch to price cap regulation has rendered Part 32 useless, and section 10 therefore requires the FCC to forebear from applying it to incumbent price cap carriers. Even if section 10 does not require complete forbearance according to petitioners, the FCC's decision not to grant partial forbearance is arbitrary and capricious. Petitioners further argue the Commission did not explain its selective enforcement of Part 32 accounting rules (which only apply to incumbent price cap carriers) and ignored the costs of complying with Part 32.

The Commission of course argues that it reasonably denied USTelecom's petition. The FCC maintains that it is not required, under its own rules, to address petitioners' *ex parte* conditional or partial forbearance requests that were not contained in the original forbearance petition as to the general requirement of Part 32 cost data. And the Commission asserts a current, federal need to regulate (1) pole attachment rates which *are* based on costs, as well as (2) incumbent price cap carriers' interstate access rates, which the FCC has a statutory duty to ensure are just, reasonable, and nondiscriminatory. We are told that Part 32 is needed to comply with section 254(k)'s prohibition on cross subsidization and section 273(e)(3)'s requirement that price cap LECs properly record their imputation costs. The Commission explains that GAAP does not provide the requisite cost data because it is merely a non-industry specific set of principles that does not meet the Commission's need for detailed cost information that is uniform across carriers. The FCC contends, moreover, that petitioners did not show that their (unsubstantiated) costs of compliance outweighed the benefits provided by Part 32's retention. Finally, the Commission maintains that Part 32 is necessary only for incumbent LECs so

they do not use their control over wholesale network facilities to impede competition or charge unreasonable rates.[5]

## A.

At oral argument, petitioners asserted that when the Commission determines whether to grant forbearance under section 10 it is engaged, under the APA, in an adjudication rather than a rulemaking. We take it the petitioners, by so arguing, were attempting to avoid our cases holding that review of an agency's denial of a rulemaking "is evaluated with a deference so broad as to make the process akin to non-reviewability." *Cellnet Commc'n, Inc. v. F.C.C.*, 965 F.2d 1106, 1111 (D.C. Cir. 1992). Although parties have taken different positions before the Commission as to the proper designation of section 10 procedures, the FCC, while suggesting they appear like rulemaking, has avoided conclusively deciding the issue. *Procedural Forbearance Order*, 24 FCC Rcd 9543, 9554 ¶ 2 (2009).

Early on, in passing, we described a pre-section 10 forbearance petition as a request for a rulemaking. *Am. Tel. & Tel. v. F.C.C.*, 978 F.2d 727, 730-31 (D.C. Cir. 1992). Our characterization was adopted and expanded to an entire category of FCC forbearance orders by the Supreme Court. *MCI Telecomms. Corp.*, 512 U.S. at 220-21 (describing the FCC's earlier forbearance orders as "a series of rules"). Actually, it should be obvious that a section 10 forbearance petition is a request for a rulemaking, since it seeks a modification of a rule

---

[5]Although petitioners claim it is unfair to impose Part 32 data requirements only on incumbent carriers, suggesting that new entrants such as wireless carriers have altered the marketplace (paradoxically those new entrants are primarily petitioners' own affiliates), they do not squarely challenge the Commission's prior determination that incumbents have market power. Of course, that would be possible in the upcoming rulemaking.

which has *only* future effect. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 216 (1988) (Scalia, J. concurring). Nevertheless, since Congress has provided specific criteria that must govern the Commission's consideration of a section 10 petition the FCC's discretion is somewhat more limited than would be true in the more typical rulemaking request.

More contentious is the question as to which party has the burden of proof. Verizon and AT&T claim that since the statute reads the FCC "shall" grant forbearance if the conditions are met, the burden is on the Commission.[6] Faced with the same issue, the Tenth Circuit concluded that since the statute was silent on the question, under *Chevron*, the Commission's interpretation – that the burden is on the petitioner – should prevail. *Qwest Corp. v. F.C.C.*, 689 F.3d 1214, 1226 (10th Cir. 2012). We agree.[7]

**B.**

Petitioners substantive challenge, essentially, is that Part 32 accounting rules, which are costly to maintain, are no longer "necessary" within the meaning of section 10(a)(1) and (2) and

---

[6] The FCC insists that the legal question of burden of proof is not properly before us because no party raised the argument at the agency level. *See* 47 U.S.C. § 405(a) (exhaustion requirement). However, petitioners are not required to raise "futile" arguments before the agency, and the FCC has decisively allocated the burden of proof to the party seeking forbearance in its *Forbearance Procedures Order* and applied that rule in the *USTelecom Order*. *See Omnipoint Corp. v. F.C.C.*, 78 F.3d 620, 635 (D.C. Cir. 1996).

[7] Section 7(c) of the APA places the burden of proof on the proponent of a rule or order, but that section governs formal rulemaking (or adjudication). 5 U.S.C. § 556(d). We do not normally think of burden of proof as applying to an informal rulemaking, yet the logic of section 7(c) seems to apply equally to this unique type of informal rulemaking.

are therefore no longer in the public interest (3). We have held that the Commission's definition of necessary – that there is a strong connection between the rule in question and the agency's purpose – is one to which we defer. *Cellular Telecomms.*, 330 F.3d at 512. But the Commission itself has stated that it must have a "current need" to maintain a statutory requirement or a challenged regulation. *AT&T Cost Assignment Forbearance Order*, 23 FCC Rcd 7302, 7313-14 ¶ 20 (2008). Petitioners insist that there is no longer such a current need because the Commission's introduction of price cap access rates replaced the old cost of service methodology.

Putting aside for a moment the question of whether the price cap regimen has generally made unnecessary Part 32 data, petitioners concede that the rates for pole attachments (any attachment by a cable television system or telecommunications service provider to a pole, duct, conduit or right-of-way owned or controlled by a utility or LEC which is required to grant such access) are still based on costs; there is no price cap for pole attachment rates.[8] Initial rates are established through private negotiations between a pole attacher and the carrier. Although neither the statute nor the FCC's implementing rules explicitly require submission of Part 32 data, negotiating parties rely on cost data contained in Part 32 to set rates, and in the event there is a dispute, to form the basis of allegations in a complaint. It follows, in adjudicating disputed pole attachment rates, the FCC relies on Part 32 cost data to determine whether the rate is reasonable – if the rate reflects actual costs, and if not, to set a lawful rate. There are currently eight section 224 complaints pending before the FCC.[9] Apart from the adjudicatory process,

---

[8] *See* 47 U.S.C. § 224(a)(4), (d)(1), (f)(1); 47 C.F.R. § 1.1404.

[9] Petitioners legitimately pointed out in their briefing that there was only one pending section 224 complaint because, prior to oral argument, the Commission had not updated its website. *Enforcement Bureau - Market Disputes Resolution Division Pending Formal*

the Commission uses (and has recently used) data derived from Part 32 to modify the formula that parties use to calculate pole attachment rates. *See USTelecom Order*, 28 FCC Rcd at 7659 ¶ 64.

Petitioners insist that Part 32 is unnecessary because the FCC has other informational sources available that allow it to comply with its statutory duties to ensure that pole attachment rates are just and reasonable – primarily GAAP.[10]

But petitioners concede that certain expense categories under Part 32 do not have a "precise corollary under GAAP" and there are "significant" differences in the two treatments of certain pole attachment expenses. The FCC asserts that as a result of this disjunction, GAAP accounting would actually increase the rate price cap carriers charge for pole attachments. *USTelecom Order*, 28 FCC Rcd at 7659-60 ¶ 65. Although petitioners claim that pole attachment rates based on GAAP-derived data *could* decline under appropriate circumstances, they do not dispute that they also could increase. Nor does the sparse record before us contain evidence as to how (or in what direction) transitioning to GAAP would result in rate distortions. In any event, petitioners admit, relying on GAAP would require carriers to develop new methods to replicate the pole attachment cost data. So, we think petitioners' argument that the FCC must rely on its price cap regimen for the setting of pole attachment rates is rather weak and easily rejected.

Perhaps recognizing the weakness of their claim regarding

_____

*Complaints,* http://www.FCC.GOV/encyclopedia/eb-pending-formal-an d-pole-action-complaints (last updated Sep. 15, 2014).

[10]Petitioners do not fully develop how the pole attachment cost data it provides to the Commission (as a condition of the FCC's earlier forbearance from filing MIS Report 43-01) varies from Part 32 data.

pole attachment rates, petitioners submitted an *ex parte* letter suggesting, *inter alia*, a partial forbearance – Part 32 data would be required *only* for pole attachment rates. The Commission, however, declined to consider a proposal submitted so late because it had insufficient time to evaluate it. We have previously said that the FCC is not obliged to consider late-filed proposals. *Feature Group IP West, LLC v. F.C.C.*, 424 Fed. App'x. 7, 10 (D.C. Cir. 2011).[11] And although the Commission has, on occasion, *sua sponte* ordered partial forbearance, *AT&T Cost Assignment Forbearance Order*, 23 FCC Rcd at 7318 ¶ 28; *USTelecom Order*, 28 FCC Rcd at 7360 ¶ 2, there is surely no obligation for the Commission to do so.

## C.

We turn to the more important question of whether Part 32 accounting data is still needed to ensure that *access* rates of incumbent LECs are "just and reasonable" within the meaning of section 10(a)(1). The Commission claims it needs that data both to evaluate existing price cap access rates, to determine whether they are adequate, but also to deal with complaints that a particular rate is discriminatory even if under the price cap rate. Petitioners assert that the Commission itself has said that it did not anticipate altering those rates, *AT&T Cost Assignment Forbearance Order*, 23 FCC Rcd at 7313 ¶ 19, and that actually there have been no complaints and subsequent requests for Part 32 data since the price cap regimen was instituted. As the Commission noted however, there was in fact one recent complaint which was not adjudicated only because the tariff was withdrawn.

---

[11] Parties may cite unpublished opinions "as precedent." *See* D.C. CIR R. 32.1(b)(1); *but see* D.C. CIR. R. 36(e)(2) ("[P]anel's decision to issue an unpublished disposition means that the panel sees no precedential value in that disposition."). We cite *Feature Group* for its persuasive authority, and adopt its dicta as a holding.

Still, petitioners argue that if the Commission were to forbear – excuse petitioners from maintaining Part 32 data – and a complaint was filed a carrier could either submit GAAP data to substantiate the reasonableness of the rates or could even recreate Part 32 data. We think the Commission's response is reasonable. As we noted earlier, GAAP is designed for investors not regulators and to recreate Part 32 data to meet a complaint would take too long. Although the Commission admits that it has not sought Part 32 data from an incumbent carrier for the purposes of investigating a tariff since the price cap regimen was instituted, it points out that the very existence of the data constitutes a deterrent to the institution of discriminatory rates.

To be sure the current need for Part 32 data – outside pole attachment rates – appears marginal. If the Commission were insisting that the incumbent carriers maintain Part 32 data merely as a competitive handicap, that would surely be illegitimate. But we have no reason to doubt the FCC's good faith. Therefore, the Commission is entitled to deference as to its purpose.

We have consistently deferred to the Commission's forbearance decisions, *Cellular Telecomms.*, 330 F.3d at 510 ("[A] measure may be 'necessary' even though acceptable alternatives have not been exhausted."); *Earthlink, Inc. v. F.C.C.*, 462 F.3d 1, 8 (D.C. Cir. 2006) (FCC's forbearance analysis may vary under the circumstances and can be made "with an eye to the future"); *In re Core Commc'ns, Inc.*, 455 F.3d 267, 282 (D.C. Cir. 2006) ("[A]gency's predictive judgments about areas that are within the agency's field of discretion and expertise are entitled to particularly deferential review."); *Feature Grp. IP West*, 424 F. App'x 7; *M2Z Networks, Inc. v. F.C.C.*, 558 F.3d 554 (D.C. Cir. 2009); *Qwest Corp. v. F.C.C.*, 482 F.3d 471 (D.C. Cir. 2007); *MCI WorldCom, Inc. v. F.C.C.*, 209 F.3d 760 (D.C. Cir. 2000), except in cases where the Commission deviated without

explanation from its past decisions, *Verizon Tel. Cos. v. F.C.C.*, 570 F.3d 294 (D.C. Cir. 2009); *AT&T Inc. v. F.C.C.,* 452 F.3d 830 (2006); *AT&T Corp. v. F.C.C.*, 236 F.3d 729 (D.C. Cir. 2001), or did not discuss section 10's criteria at all, *Verizon Tel. Cos. v. F.C.C.*, 374 F.3d 1229 (D.C. Cir. 2004). Since we think that the FCC reasonably concluded that it continued to need Part 32 data to ensure that access rates were not discriminatory – we defer once more – therefore, it is unnecessary for us to consider factors two and three of subsection 10(a).

\* \* \*

We are also told that the Commission plans to consider the continuing need for Part 32 data in a pending rulemaking. We have held that the Commission cannot defend against the forbearance petition by pointing to an upcoming rulemaking (such a scenario is not implicated here). *AT&T Corp.*, 236 F.3d at 738. On the other hand, that does not mean that considerations that were relevant to the forbearance petition would not have continuing relevance in the ordinary rulemaking. It may well be that petitioners' contention that Part 32 data is no longer justified by the expense will prove more compelling.[12]

The petition for review is denied.

*So ordered.*

---

[12]Cost data presented by petitioners was sparse. *See Petition of USTelecom for Forbearance*, WC Docket No. 12-61 at 40 (Feb. 16, 2012) (USTelecom estimating "millions of dollars" spent on maintaining two separate sets of books); *Ex Parte Letter from USTelecom to FCC*, WC Docket No. 12-61 at 13 (Apr. 18, 2013) (AT&T noting that it is "difficult to quantify all the costs of compliance" and estimating $18 to $24 million in annual costs); Oral Arg. (26:15-27:00) (AT&T spends almost $24 million a year simply to modify accounting programs to match up with Part 32). The record lacks *any* information about petitioner Verizon's cost of compliance.