**WORLDCOM, INC., et al., Petitioners,**

**v.**

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

**United States Telephone Association, et al., Intervenors.**

Nos. 99–1395, 99–1404 & 99–1472.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 30, 2000.

Decided Feb. 2, 2001.

---

Carl S. Nadler argued the cause for petitioners and supporting intervenors. With him on the briefs were Ian Heath Gershengorn, Thomas F. O'Neil, III, William Single, IV, Jeffrey A. Rackow, Mark C. Rosenblum, Peter H. Jacoby, Judy Sello, Gene C. Schaerr, James P. Young, Brian Conboy, Thomas Jones, Albert H. Kramer, Robert J. Aamoth, Charles C. Hunter and Catherine M. Hannan. Maria L. Woodbridge entered an appearance.

Lisa S. Gelb, Counsel, Federal Communications Commission, argued the cause for respondent. With her on the brief were Christopher J. Wright, General Counsel, and John E. Ingle, Deputy Associate General Counsel. Robert B. Nicholson and Robert J. Wiggers, Attorneys, U.S. Department of Justice, Daniel M. Armstrong, Associate General Counsel, Federal Communications Commission, and Laurence N. Bourne, Counsel, entered appearances.

Mark L. Evans, Rachel E. Barkow, M. Robert Sutherland, Dan L. Poole, Robert B. McKenna, James D. Ellis, Alfred G. Richter, Jr., Roger K. Toppins, Hope E. Thurrott, Charles J. Scharnberg, William P. Barr, M. Edward Whelan III, Michael E. Glover, Edward Shakin and Joseph DiBella were on the brief of intervenors Bell-South Corporation, et al. John H. Harwood II and William R. Richardson, Jr. entered appearances.

Before: EDWARDS, Chief Judge, and SENTELLE and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Petitioners, WorldCom, AT&T, Time Warner Telecom, and other long distance telephone service providers, seek review of the FCC's Fifth Report and Order and Further Notice of Proposed Rulemaking in *In re Access Charge Reform*, 14 F.C.C.R. 14221, 1999 WL 669188 (1999) (hereinafter *"Order"* or *"Pricing Flexibility Order"*). That order grants local exchange carriers ("LECs") immediate pricing flexibility for some interstate access

services and establishes procedures through which LECs may seek substantial additional relief from existing price cap regulation. Petitioners maintain that the *Order* is arbitrary, capricious, and contrary to law in that it violates the FCC's statutory mandate to ensure "just and reasonable" prices for telecommunication services and promote the public interest. Several LECs—BellSouth, Qwest, SBC Communications, and Verizon—intervene in support of the FCC.

We hold that the FCC's decision to grant additional pricing flexibility to incumbent LECs through a series of collocation based triggers, deregulation of new services, and deaveraging of rates was neither arbitrary and capricious nor contrary to law. The FCC made a reasonable policy determination that collocation was a sufficient proxy for market power in determining whether to grant pricing flexibility to LECs and sufficiently explained the basis for its decision to grant immediate pricing flexibility for some services. For these reasons, we uphold the FCC's order and deny the petitions for review.

## I. Background

### A. Legal and Regulatory Context

In recent years, the FCC has sought to facilitate greater competition in the provision of both long-distance and local telephone service. *See, e.g., AT&T v. FCC*, 220 F.3d 607 (D.C.Cir.2000); *Bell Atl. Tel. Cos. v. FCC*, 79 F.3d 1195 (D.C.Cir.1996); *Nat'l Rural Telecom Ass'n v. FCC*, 988 F.2d 174 (D.C.Cir.1993). Competition for telephone services, where it exists, serves the FCC's statutory goal of ensuring fair and reasonable prices for telecommunications services. Therefore, as telephone markets become more competitive, the FCC has lessened regulatory control over those markets, including the market for interstate access services. It is within this evolving regulatory context that this case arises.

### 1. Interstate Access Services

Local telephone service is provided by local exchange carriers. 47 U.S.C.

§ 153(26). Typically, one LEC is the dominant, or "incumbent," service provider in each local area. Until relatively recently, the incumbent LECs had virtual monopolies over the provision of local phone service in their territories.

Long distance service—that is, service between local access and transport areas ("LATAs") or "InterLATA" service—is, for the most part, provided by interexchange carriers ("IXCs"), such as petitioners WorldCom and AT&T. Long distance providers are reliant upon LECs to reach their customers. When a customer makes a long distance call, the IXC must have "access" to the local networks at both the originating and receiving end of the call in order to complete the connection. Generally, the LEC connects the call from the caller to a switch or "end office," which is in turn connected to a "serving wire center" (SWC), which is itself connected to an interconnection point, or "point of presence" (POP), with the long distance carrier. This same series of connections will also be made at the receiving end of the phone call—from POP to SWC to switch to call recipient. LECs charge the IXCs for providing this "access service" in accordance with 47 C.F.R. Part 69. IXCs then bill customers directly for long distance calls.

There are two types of access service: "switched access" and "special access." Switched access service requires the creation of a connection between the caller and the long distance company on a "call-by-call" basis. This entails (1) a connection between the caller and a local LEC switch, (2) a connection from the LEC switch to the SWC ("interoffice transport"), and (3) an entrance facility which connects the SWC and the long distance company's POP. Switched access can either be dedicated to a particular IXC ("dedicated transport" or "direct trunked transport") or shared among IXCs. "Special access" service, on the other hand, uses dedicated lines between the customer and the IXC's local POP. Switched access is used by most residential customers.

Most users of special access services are companies with high call volumes.

For quite some time incumbent LECs dominated access service markets. In recent years, however, other companies have begun to enter these markets. Market entrants typically provide a portion of full access service, such as from the IXC POP to the SWC, in any given market. This development was facilitated by changes in FCC regulations. Beginning in 1992, the FCC required incumbent LECs to permit competitors to "collocate" their equipment at LEC wire centers and connect directly to the LEC networks as a means of spurring additional competition in access service. *See Expanded Interconnection with Local Tel. Co. Facilities,* 7 F.C.C.R. 7369, ¶ P1–3, 39, 1992 WL 691029, *reconsidered* 8 F.C.C.R. 127, 1992 WL 691060 (1992), *vacated in part and remanded in part, Bell Atl. Tel. Cos. v. FCC,* 24 F.3d 1441 (D.C.Cir.1994). Now, the FCC believes, there may be sufficient competition for access services to justify deregulatory measures.

2. Regulatory Framework

For years the FCC imposed traditional rate of return regulation on the LECs. Beginning in 1990, however, the FCC substituted "price cap" regulation for the largest LECs. *See Nat'l Rural Telecom Ass'n,* 988 F.2d at 178–79. Price cap regulation imposes a "cap" on aggregate prices charged by LECs for certain services in a given area. *See* 47 C.F.R. §§ 61.41–.49. For the purposes of setting the caps, services are grouped in various "baskets." *See* 47 C.F.R. § 61.42(d). These are the common line basket, traffic-sensitive basket, trunking basket, and special access basket, the latter two of which are at issue in this case. LECs are also required to charge averaged (i.e., uniform) rates in given service areas, absent substantial cost differentials. *See* 47 C.F.R. § 69.3(e)(7). This averaging requirement is designed to prevent price discrimination by LECs.

Price cap regulation offers more pricing flexibility than rate of return regulation, as companies are relatively free to set their own prices so long as they remain below the cap. A company can raise the price for one service so long as that increase is offset by a price decrease in another. Prices that are below upper price "bands" for a given service are also presumed lawful and given streamlined review by the FCC. *See Bell Atl. Tel. Cos.*, 79 F.3d at 1198. The FCC implemented price cap regulation for LECs as "a transitional regulatory scheme until actual competition makes price cap regulation unnecessary." *Order* ¶ 11.

Price cap regulation is supplemented by tariff requirements for "dominant carriers" (including all regional Bell Operating Companies in their local service areas), under which companies are required to publish rate changes before they are implemented. 47 U.S.C. § 203(a), § 204(a). Tariffs must be filed fifteen days in advance of price increases and seven days in advance of price decreases. 47 U.S.C. § 204(a)(3). This allows both the FCC and affected customers to review and challenge price changes by LECs. The tariff requirement is waived for those carriers that are deemed non-dominant because they face substantial competition from other firms.

### 3. The 1996 Act

In 1996, Congress enacted the Telecommunications Act of 1996 to "promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Pub. L. No. 104–104, 110 Stat. 56, 56 (Introductory Statement). The 1996 Act requires incumbent LECs to grant competitors (such as the IXCs) greater access to their local networks through collocation of facilities, the purchase and resale of "unbundled network elements" and services, and mandated interconnection. 47 U.S.C. § 251(c)(2)-(4). In response to

the 1996 Act, the FCC has sought to move toward greater competition for, and less regulation of, telecommunications services.

### B. The FCC's *Pricing Flexibility Order*

On August 5 1999, the FCC adopted the Fifth Report and Order and Further Notice of Proposed Rulemaking in *In re Access Charge Reform*, 14 F.C.C.R. 14221, 1999 WL 669188 (1999). In accordance with the stated goals of the 1996 Act, the *Order* granted immediate pricing flexibility for some services and set competition thresholds to trigger additional relaxation of regulatory controls. According to the FCC, the *Order* was the "logical next step in the Commission's ongoing effort to coordinate reduced regulation with competitive developments." Brief for Federal Communications Commission at 9.

### 1. Immediate Pricing Flexibility

The *Order* provides immediate pricing flexibility for LECs in three important respects: (1) LECs may introduce "new services" subject to a streamlined approval process; (2) LECs may offer deaveraged rates for services in the trunking basket; and (3) interstate interLATA and intra-LATA toll services are removed from price cap regulation. *Order* ¶ ¶ 34–66. Petitioners challenge the first and second changes as unlawful.

New services are those services that, by definition, "expand[ ] the range of service options available to consumers." *Id.* ¶ 37. Previously, an LEC needed a waiver to offer a new switched access service that did not fit into the preexisting rate structure. The LEC was required to demonstrate that such a waiver was in the "public interest." Finding that existing "new service rules impede the introduction of new services," *id.* ¶ 37, the FCC *Order* eliminates the required "public interest" showing and allows LECs to file tariffs for new services with only one-day's notice. LECs are still prohibited from offering "new services outside of price cap regulation." *Id.* ¶ 43.

Under the FCC's regulations, price cap LECs are generally required to geographically average charges for access elements across a given "study area" (typically a state or region). 47 C.F.R. § 69.3(e)(7). Deaveraging—the disaggregation · of charges for specific service access elements—was only allowed in up to three zones per LEC and only subject to certain conditions, such as intensity of use. Under the new rules, LECs may define up to seven zones subject to the requirements that (1) each zone other than the highest price zone accounts for at least fifteen percent of the LEC's trunking basket revenues in the study area, and (2) annual price increases in a zone cannot exceed fifteen percent. *Order* ¶ 62. According to the FCC, this new flexibility "enhances the efficiency of the market for those services by allowing prices to be tailored more easily and accurately to reflect costs and, therefore, promotes competition." *Id.* ¶ 59.

The *Pricing Flexibility Order* also removes interLATA and intraLATA toll services from price cap regulation upon an LEC's implementation of toll dialing parity. *See id.* ¶ 45. Toll service is "telephone service between stations in different exchange areas for which there is made a separate charge not included in contracts with subscribers for exchange service." 47 U.S.C. § 153(48). When an LEC provides toll dialing parity, it permits its local service customers within a given calling area "to make a local telephone call notwithstanding the identity of the customer's or the called party's telecommunications service provider." 47 C.F.R. § 51.207. LECs are required to implement toll dialing parity throughout their service areas. *See* 47 C.F.R. §§ 51.205, .209, .211, .213. Upon meeting this requirement for all interLATA and intraLATA toll services, an LEC's provision of these services is removed from price cap regulation. This portion of the *Pricing Flexibility Order* is not challenged in this case.

### 2. Future Pricing Flexibility

The FCC order also provides for additional pricing flexibility once an LEC shows that certain competitive thresholds ("triggers") have been met in a given metropolitan statistical area (MSA). According to the FCC, this step is merely the latest effort to "allow incumbent LECs progressively greater pricing flexibility as they face increasing competition." *Order* ¶ 67. The triggers measure market competition based upon investments in infrastructure by potential competitors. The FCC's stated aim is to balance the benefit of further deregulation with the potential risk of exclusionary behavior or increased prices for consumers. *See id.* ¶ 69 (noting that the relief "if granted prematurely, might enable price cap LECs to (1) exclude new entrants from their markets, or (2) increase rates to unreasonable levels"). Therefore, the more relief sought, the higher the trigger is set—that is, a greater · level of investment by competitors is required.

The relief comes in two phases. In Phase I, LECs may offer contract tariffs and volume and term discounts, while remaining subject to some price cap rules and tariff requirements. In addition, for LECs subject to Phase I relief, new tariffs only require one day advance notice as opposed to seven or fourteen days notice under current rules. Phase I relief is available upon a showing "that competitors have made irreversible investments in the facilities needed to provide the services at issue, thus discouraging incumbent LECs from successfully pursuing exclusionary strategies." *Id.* ¶ 69. Phase I relief is potentially available for dedicated transport (entrance facilities, direct-trunked transport), channel terminations, and common line and traffic-sensitive services.

In order to obtain Phase I relief for dedicated transport services an incumbent LEC must show collocation in fifteen percent of wire centers within the MSA in which relief is sought, or in wire centers accounting for at least thirty percent of

revenues for services in question. *Id.* ¶ 93. In addition, at least one competitor must rely on transport facilities provided by a non-incumbent LEC in each wire center relied on in the applicant LEC's petition. Phase I relief is available for channel terminations upon a showing of collocation in fifty percent of wire centers within the MSA in which relief is sought or in wire centers accounting for at least sixty-five percent of revenues for services in question. *Id.* ¶¶ 105–06. The trigger for common line and traffic–sensitive services is that a competitor must offer service to fifteen percent of incumbent LEC's customer locations using its own transport and switching facilities. *Id.* ¶ 120.

In each case Phase I relief is subject to several conditions to prevent price discrimination or other potentially predatory behavior. Under Phase I, contract tariff rates must be available to all similarly situated customers, and volume discounts must be available to all similarly situated customers willing to make equivalent term commitments. *Id.* .¶¶ 124, 130. Incumbent LECs must continue to offer services pursuant to price caps as well. *Id.* ¶ 24. Finally, LECs remain subject to FCC enforcement actions for anticompetitive behavior. *See, e.g., id.* ¶¶ 127, 131; 47 U.S.C. § 208.

In Phase II, LECs are given greater freedom to raise and lower rates outside of price cap regulation. Phase II relief is available for the same services and may be sought once "competitors have established a significant market presence in the provision of the services at issue." *Order* ¶ 69. Phase II relief allows LECs to offer services outside of price cap regulation, though LECs must still file generally available tariffs and remain subject to FCC enforcement actions for anticompetitive behavior.

In order to obtain Phase II relief for dedicated transport services an incumbent LEC must show collocation in fifty percent of wire centers within the MSA in which relief is sought or in wire centers account-

ing for at least sixty-five percent of revenues for services in question. *Id.* ¶¶ 148–49. In addition, as with Phase I relief, at least one competitor must rely on transport facilities provided by non-incumbent LECs in each wire center relied on in the applicant LEC's petition. *Id.* ¶ 82. Phase II relief is available for channel terminations upon a showing of collocation in sixty-five percent of wire centers within the MSA in which relief is sought or in wire centers accounting for at least eighty-five percent of revenues for services in question. *Id.* ¶ 150. The FCC has not yet set a collocation trigger for common line and traffic–sensitive services Phase II relief.

As with Phase I relief, LECs must file tariffs and remain subject to FCC enforcement actions for anticompetitive behavior under the relevant statutory provisions. *Id.* ¶ 151. The FCC acknowledged that its rule may allow Phase II relief before the manifestation of actual competitive alternatives for interstate access service customers but that "the costs of delaying regulatory relief outweigh the potential costs of granting it before IXCs have a competitive alternative for each and every end user." *Id.* ¶ 144.

Both Phase I and Phase II relief are available on an MSA–wide basis. This is because, according to the FCC, "MSAs best reflect the scope of competitive entry, and therefore are a logical basis for measuring the extent of competition." *Id.* ¶ 72. Relief is not available on a rural service area basis. Rather relief is available for the "non-MSA parts of a study area"— typically one or more rural service areas— if the triggers are satisfied for the entire area. *Id.* ¶ 76. The FCC acknowledges the "theoretical possibility" that granting relief on an MSA-wide basis could enable LECs to engage in predatory behavior. *Id.* ¶ 83. However, the Commission concluded "the costs, particularly the administrative costs, of granting pricing flexibility on a wire center-by-wire center basis outweigh the benefits of protecting against

such theoretical harms." *Id.* The Commission declined to provide relief on a LATA basis, as in some states the relevant LATA encompasses the entire states. *Id.* ¶ 73.

The triggers relied upon by the FCC are largely based upon collocation by competitors at LEC facilities. The FCC adopted this trigger for two reasons. First, the FCC concluded that collocation is a reasonable proxy for competitive conditions in a given MSA. *Id.* ¶ 78. Specifically, the FCC found that "collocation by competitors in incumbent LEC wire centers is a reliable indication of sunk investment by competitors." *Id.* ¶ 81. Sufficient sunk investment of this sort, in the FCC's view, will discourage "exclusionary pricing behavior." *Id.* ¶ 78. In addition, the FCC determined that the collocation level is "an easily verifiable, bright-line test" that serves "to avoid excessive administrative burdens." *Id.* In this sense, the trigger balances the FCC's desire for an accurate measure of actual competitive conditions in a given MSA, while also establishing a clear administrative standard.

The FCC acknowledged that adopting specific thresholds, like utility ratemaking, "is not an exact science." *Id.* ¶ 96; *accord United States v. FCC,* 707 F.2d 610, 618 (D.C.Cir.1983). "Rather, the thresholds are policy determinations based on our agency expertise, our interpretation of the record before us in this proceeding, and our desire to provide a bright-line rule to guide the industry." *Id.* ¶ 96 (footnote omitted). Moreover, the FCC claimed its "effort to select triggers that precisely measure competition for particular services also is hampered by the lack of verifiable data concerning competitors' revenues and facilities." *Id.*

To set the proper trigger thresholds the FCC examined a few local markets to assess the extent of market penetration that correlates with a given level of collocation investment, and scaled the various triggers to correlate with the level of relief sought. Thus, the Phase II triggers are higher than those for Phase I, and different services have different trigger levels depending upon the FCC's estimation of the threat of predatory or anticompetitive conduct. Thus, the amount of collocation required to obtain Phase I relief for channel terminations is higher than for dedicated transport services.

## II. Analysis

### A. Collocation Thresholds for Pricing Flexibility

Petitioners challenge the FCC's decision to offer LECs relief from price cap regulation based upon a showing that one or more competitors have made substantial local investments in collocation. Petitioners contend that this decision was arbitrary and capricious and contrary to law because the FCC failed to condition this relief upon a finding of competition sufficient to protect consumers from anticompetitive conduct. Collocation, petitioners contend, is a poor proxy for actual competition in the provision of interstate access services. As a result, petitioners claim that the *Order* violates the Commission's statutory duty to ensure that prices are "nondiscriminatory, 'just,' and 'reasonable.'"

Petitioners specifically challenge three aspects of the FCC's new pricing flexibility framework: (1) basing the triggers for pricing flexibility on collocation rather than an analysis of actual competitive conditions; (2) granting pricing flexibility on an MSA-wide basis based on collocation in only a portion of the MSA; and (3) selecting specific triggers in an arbitrary fashion and without sufficient explanation. In assessing these claims, we consider whether the FCC's actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This is a "deferential standard" that "presume[s] the validity of agency action." *Southwestern Bell Tel. Co. v. FCC,* 168 F.3d 1344, 1352 (D.C.Cir.1999); *accord Jersey Shore*

*Broadcasting Corp. v. FCC*, 37 F.3d 1531, 1537 (D.C.Cir.1994). Like agency rate-making, price cap regulation of local carriers "involves policy determinations in which the agency is acknowledged to have expertise." *Time Warner Entertainment Co. v. FCC*, 56 F.3d 151, 163 (D.C.Cir. 1995) (per curiam) (internal quotation omitted). Therefore, it is not our role to second guess the FCC's policy judgment, so long as it comports with established standards of administrative practice. "The FCC's judgment about the best regulatory tools to employ in a particular situation is ... entitled to considerable deference from the generalist judiciary." *Western Union Int'l, Inc. v. FCC*, 804 F.2d 1280, 1292 (D.C.Cir.1986).

### 1. Collocation

■ Under the *Pricing Flexibility Order*, LECs are eligible for regulatory relief upon a showing that there is sufficient collocation by one or more competitors. In this fashion, the FCC uses investment in collocation as a proxy for competition in access service. Petitioners contend that this is arbitrary and capricious because collocation is not a sufficient measure of actual market competition. Therefore, petitioners argue, the FCC can offer no assurance that LECs will continue to offer "just" and "reasonable" rates once they are granted pricing flexibility. To petitioners, the regulatory relief provided for by the FCC's *Order* is tantamount to foregoing dominant carrier regulation altogether, and can only be justified upon a finding of actual competition.

■ It may well be that collocation is a poor measure of market share, as petitioners attest. That competing firms have invested in collocation does not mean that they have captured a significant portion of the market for access services. Yet the FCC did not conclude that a loss of market share was necessary to prevent an incumbent LEC from raising prices. The FCC has long held that market share is not the be-all, end-all of competition. *See AT&T*

*Corp. v. FCC*, 236 F.3d 729, 736 (D.C.Cir. 2001) ("the FCC has never viewed market share as an *essential* factor" in evaluating market competition) (emphasis in original). It is merely one of several relevant factors considered when making a market power determination. For example, in *Motion of AT&T Corp. to Be Declared Non–Dominant for International Service*, 11 F.C.C.R. 17,963, 17,976 ¶ 34, 1996 WL 926568 (1996), the FCC wrote that

> market shares, by themselves, are not the sole determining factor of whether a firm possesses market power. Other factors, such as demand and supply elasticities, conditions of entry and other market conditions must be examined to define a relevant market, and determine whether a particular firm can exercise market power in the relevant market.

The FCC is free to change this policy so long as it provides an adequate explanation for the shift, *AT&T*, at 737, but it has not done so.

As the FCC noted in its *Order*, the presence of substantial sunk investment, and the resulting potential for entry into the market, can limit anticompetitive behavior by LECs. Specifically, the FCC found that:

> Once multiple rivals have entered the market and cannot be driven out, rules to prevent exclusionary pricing behavior are no longer necessary. Investment in facilities, particularly those that cannot be used for another purpose, is an important indicator of such irreversible entry. If a competitive LEC has made a substantial sunk investment in equipment, that equipment remains available and capable of providing service in competition with the incumbent, even if the incumbent succeeds in driving that competitor from the market.

*Order* ¶ 80. Even if a rival LEC is unsuccessful at challenging an incumbent, "the presence of facilities-based competition with significant sunk investment makes ex-

clusionary pricing behavior costly and highly unlikely to succeed." *Id.* Collocation, in the FCC's expert view, "is a reliable indication of sunk investment by competitors." *Id.* ¶ 81. Therefore, collocation can reasonably serve as a measure of competition in a given market and predictor of competitive constraints upon future LEC behavior.

Whatever its faults as a measure of competition, the FCC found collocation to be superior to the various alternatives proposed by petitioners during the notice and comment period. *See id.* ¶¶ 84, 104. Petitioners, for their part, offer no alternative save a painstaking analysis of market conditions such as that which is required when an LEC seeks classification as a nondominant carrier or the forbearance of dominant carrier regulation under Section 10 of the Communications Act. *See, e.g., AT&T Corp. v. FCC,* 236 F.3d 729 (D.C.Cir.2001). The FCC determined that this would be burdensome and time-consuming—a point which petitioners do not contest—and thus not appropriate in all cases. It therefore sought an alternative for the purpose of providing pricing flexibility, in addition to the statutory procedure under Section 10, 47 U.S.C. § 160, which remains a "viable and independent means" for carriers to seek regulatory relief. *AT&T,* 236 F.3d at 737.

That the FCC chose to rely upon an admittedly imperfect measure of competition does not render its use arbitrary and capricious. *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC,* 737 F.2d 1095, 1116 (D.C.Cir.1984) ("*NARUC*"). Nor is the FCC's decision to make ease of administration and enforceability a consideration in setting its standard for regulatory relief. So long as the FCC's proxy is reasonable, as it is here, we have no basis upon which to require the FCC to engage in a more searching analysis of competition before granting pricing flexibility. *Cf. United States v. FCC,* 652 F.2d 72, 90–91 (D.C.Cir. 1980) (en banc) ("Someone must decide when enough data is enough. In the first instance that decision must be made by the Commission.... To allow others to force the Commission to conduct further evidentiary inquiry would be to arm interested parties with a potent instrument for delay.").

Petitioners emphasize the FCC's concession that the pricing flexibility contained in the *Order* could "if granted prematurely . . . enable price cap LECs to (1) exclude new entrants from their markets, or (2) increase rates to unreasonable levels." *Order* ¶ 68. Petitioners contend it is reversible error for the FCC to fail to show that its new regulations will result in "just and reasonable" rates for consumers. *See Farmers Union Cent. Exch., Inc. v. FERC,* 734 F.2d 1486, 1510 (D.C.Cir.1984).

The FCC readily admits that its decision to adopt the thresholds contained in the *Pricing Flexibility Order* was dependent, at least in part, on the agency's predictive forecasts. Despite their inherent uncertainty, there is little question that agency prognostications of this sort may be used in the formulation of policy; "it is within the scope of the agency's expertise to make such a prediction about the market it regulates, and a reasonable prediction deserves our deference notwithstanding that there might also be another reasonable view." *Environmental Action, Inc. v. FERC,* 939 F.2d 1057, 1064 (D.C.Cir.1991). There is no statutory requirement that the FCC be confident to a metaphysical certainty of its predictions about the future of competition in a given market before it may modify its regulatory scheme.

Petitioners also contend that the FCC's reliance upon a proxy for competition is arbitrary and capricious because it is contrary to Commission precedent. Petitioners argue that since the *Pricing Flexibility Order* would grant incumbent LECs much of the relief afforded to carriers that are declared non-dominant, the FCC should be precluded from granting such

relief without engaging in the sort of competition analysis it conducted when considering whether to declare a carrier non-dominant. We do not agree.

The Commission readily admits it made different findings when declaring AT&T to be non-dominant, as petitioners claim. *See Motion of AT&T Corp. to Be Reclassified as a Non–Dominant Carrier,* 11 F.C.C.R. 3271, 1995 WL 625633 (1995). However, the *Pricing Flexibility Order* expressly does "not grant incumbent LECs all the regulatory relief . . . afford[ed] to nondominant carriers." *Order* ¶ 151. Even those LECs which receive Phase II relief must still file tariffs. This is not insignificant; tariff filing is the "centerpiece of . . . common carrier regulation." *Southwestern Bell Tel. Co. v. FCC,* 19 F.3d 1475, 1479 (D.C.Cir.1994). Therefore, the fact that the FCC did not engage in the thorough competition analysis common in non-dominance proceedings does not render the FCC's action arbitrary and capricious.

Petitioners' appeal to other FCC precedent is equally unavailing. For instance, petitioners note that in the *UNE Remand Order,* the FCC preferred actual measures of competition to a "bright-line test" in determining when to relieve LECs of specific regulatory burdens. *In re Implementation of the Local Competition Provisions of the Telecomms. Act of 1996,* 15 F.C.C.R. 3696, 1999 WL 1008985 (1999). However, this proceeding concerned the conditions upon which local service providers are given access to unbundled transport in the first place, *not* whether deregulatory measures are warranted once competitive providers have used such access to gain a foothold in a given market.

■ There is no rule against agencies adopting new policy positions. "Everyone agrees that an agency's change of mind does not itself render the agency's action arbitrary." *Bell Atl.,* 79 F.3d at 1202. Rather "[w]hat matters is the Commission's explanation." *Id.* Agencies are "not bound to the service of any single regulatory formula; they are permitted, unless

their statutory authority otherwise plainly indicates, to make pragmatic adjustments which may be called for by particular circumstances." *Permian Basin Area Rate Cases,* 390 U.S. 747, 776–77, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968) (internal quotation omitted). Here, the Commission determined that there was reason to modify the regulatory requirements imposed upon LEC provision of access services and, unlike in its consideration of U.S. West's forbearance petition, thoroughly explained why the Commission found it appropriate to grant incumbent LECs relief from existing regulations upon certain competitive showings. *See AT&T Corp. v. FCC,* 236 F.3d 729 (D.C.Cir.2001) (remanding FCC denial of forebearance petition for failure to adequately explain departure from FCC precedent).

More broadly, the FCC contends that the *Order* should not be viewed in isolation, but rather as an additional step along the road of greater deregulation and pricing flexibility in the interstate access market. *See, e.g., Order* ¶ 67. Beginning in 1990, the FCC has taken several steps to encourage innovation, cost-reduction, and greater efficiency by reducing regulatory strictures in favor of market discipline. *See, e.g., id.* ¶¶ 11–18 (summarizing replacement of rate-of-return regulation with price-cap regulation and subsequent developments). Much as the FCC decided that replacing rate-of-return regulation with price cap regulation furthered the public interest, it has now determined that relaxing price cap regulation, when certain levels of collocation have been achieved, furthers its statutory mandate and promotes the public interest. Petitioners fail to show how this conclusion is arbitrary and capricious or otherwise contrary to law.

### 2. MSA–Wide Deregulation

■ Petitioners contend that the FCC was arbitrary and capricious and abdicated its statutory obligations by authorizing MSA-wide relief upon a showing of colloca-

tion in only a portion of the MSA. According to petitioners, due to this provision of the *Pricing Flexibility Order* the FCC cannot ensure that interstate access service prices will be just and reasonable, and therefore the collocation triggers are unlawful. According to petitioners, the FCC's previous orders establish that in analyzing competitive issues, the proper "geographic market aggregates those consumers with similar choices regarding a particular good or service in the same geographical area." *NYNEX Corp.*, 12 F.C.C.R. 19,985 ¶ 54, 1997 WL 465170 (1997). With the *Pricing Flexibility Order*, however, the FCC lumped together customers that do not have similar competitive alternatives into larger geographic markets—MSAs—for the purpose of regulatory relief. As a result, petitioners contend, LECs will gain regulatory relief while maintaining substantial bottlenecks and market power.

The FCC considered this objection in devising its *Order* and nonetheless concluded that pricing flexibility should be granted on an MSA-wide basis. The FCC defined "the geographic area that it should use for purposes of reviewing requests for pricing flexibility ... narrowly enough so that the competitive conditions within each area are reasonably similar, yet broadly enough to be administratively workable." *Order* ¶ 71. Commenters proposed both larger and smaller relief areas. The FCC settled upon MSAs because, in the FCC's expert view, they "best reflect the scope of competitive entry." *Id.* ¶ 72. Upon review, the FCC decided that smaller geographic areas would require incumbent LECs to file too many pricing flexibility petitions to achieve meaningful relief—a conclusion petitioners do not dislodge with any evidence to the contrary.

 At bottom, petitioners' objection to the FCC's decision to offer pricing flexibility on an MSA-wide basis amounts to a difference in policy preferences. This is not a sufficient basis upon which to upset the FCC's determination. *See Time War-*

*ner Entertainment,* 56 F.3d at 163. The FCC considered alternatives to MSA-wide relief and determined that, on balance, these alternatives would be less beneficial to consumers and regulated entities. As the FCC provided an adequate explanation for this conclusion, we uphold the Commission's conclusion.

### 3. Trigger Level Selection

 Petitioners' objections to the specific collocation thresholds established by the FCC are no more than policy differences with the Commission. Like any agency, the FCC must provide a rational basis when setting a number for a standard, but it is not held to a standard of perfection. The standard for reviewing such determinations was outlined in *WJG Telephone Co. v. FCC*:

> It is true that an agency may not pluck a number out of thin air when it promulgates rules in which percentage terms play a critical role. When a line has to be drawn, however, the Commission is authorized to make a "rational legislative-type judgment." If the figure selected by the agency reflects its informed discretion, and is neither patently unreasonable nor "a dictate of unbridled whim," then the agency's decision adequately satisfies the standard of review.

675 F.2d 386, 388–89 (D.C.Cir.1982) (citations omitted); *accord NARUC,* 737 F.2d at 1141.

 Petitioners are correct that the Commission may not evade review of its decision-making merely by asserting that the thresholds were "policy determinations." *See San Antonio v. United States,* 631 F.2d 831, 852 (D.C.Cir.1980) (That a decision involves a policy judgment "does not excuse the [agency] from articulating fully and carefully the methods by which, and the purposes for which, it has chosen to act.") (internal quotes omitted). Yet the FCC is not required to identify the optimal threshold with pinpoint precision. It is

only required to identify the standard and explain its relationship to the underlying regulatory concerns. The FCC notes that this court is "generally unwilling to review line-drawing performed by the Commission unless a petitioner can demonstrate that lines drawn ... are patently unreasonable, having no relationship to the underlying regulatory problem." *Cassell v. FCC*, 154 F.3d 478, 485 (D.C.Cir.1998) (internal quotations omitted). The relevant question is "whether the agency's numbers are within a 'zone of reasonableness,' not whether its numbers are precisely right." *Hercules Inc. v. EPA*, 598 F.2d 91, 107–08 (D.C.Cir.1978). Indeed, just last term we held that "the Commission has wide discretion to determine where to draw administrative lines, and appellants point to nothing suggesting that the agency abused its discretion in drawing the line[s]" where it did. *AT&T Corp.*, 220 F.3d at 627.

The FCC made a predictive judgment that the amount of collocation required for each trigger will be sufficient to constrain anticompetitive practices by incumbent LECs. The FCC also looked at areas where there was substantial collocation to determine whether that correlated with substantial involvement in competitive transport facilities. *See, e.g., Order* ¶¶ 81, 95. For example, the FCC reviewed evidence that collocation in approximately eighteen percent of wire centers corresponded to over 2,000 miles of competitive fiber facilities. *See id.* ¶ 95. The FCC also notes that there are reasons to believe that, if anything, collocation underestimates competition in relevant markets as "it fails to account for the presence of competitors that ... have wholly bypassed incumbent LEC facilities." *Id.* Weighing these factors, the FCC concluded that its collocation triggers were sufficiently protective of the public interest. This is precisely the sort of "rational legislative-type judgment" the FCC is empowered to exercise and we are required to respect.

B. Immediate Pricing Flexibility for New Services

 Petitioners also challenge the FCC's decision to grant LECs immediate pricing flexibility for new services. Prior to the new rule LECs were required to tariff new services fifteen days in advance and to demonstrate that prices were reasonable given the carrier's direct costs of providing the service. As a result of the FCC's *Pricing Flexibility Order*, LECs may tariff with only one day's notice and (with the exception of loop-based services) need not show that the prices for new services bear any relation to costs. As noted above, the FCC granted pricing flexibility for new services because it found that existing regulatory requirements delayed the development and introduction of new services to the detriment of consumers. *See id.* ¶ 37.

Petitioners contend that the FCC's decision to grant immediate pricing flexibility for new services is unlawful because it compromises the Commission's "fundamental obligation" to ensure that rates are just and reasonable. Section 201(b) of the Communications Act provides that "[a]ll charges ... shall be just and reasonable, and any such charge ... that is unjust or unreasonable is declared to be unlawful." 47 U.S.C. § 201(b). Citing the Second Circuit, petitioners argue that there is "no authority for the proposition that the FCC may abdicate its responsibility" under section 201(b) to regulate dominant carriers so as to ensure "just" and "reasonable" rates. *AT&T v. FCC*, 572 F.2d 17, 25 (2d Cir.1978).

 Contrary to petitioners' claims, there is nothing inherently unreasonable in the Commission's shift to streamlined review of new services. *Cf. Nat'l Rural Telecom Ass'n v. FCC*, 988 F.2d 174, 185 (D.C.Cir.1993) ("In light of the FCC's objective of eliminating the filing burdens of both itself and the carriers, and its reasonable finding that caps and bands render the prospect of unreasonable filings sufficiently improbable, we find streamlined re-

view to be reasonable."). The Commission is free to reduce regulatory requirements where, as here, it finds that less regulation will better serve its statutory goals. As we noted above, "[t]he FCC's judgment about the best regulatory tools to employ in a particular situation is ... entitled to considerable deference from the generalist judiciary." *Western Union Int'l*, 804 F.2d at 1292. Here, the Commission determined that consumers are better served by loosening the government's grip on new service offerings and prices.

Petitioners further argue that insofar as new services represent significant technological advances over existing services, failure to offer that service to consumers or competitors at a reasonable price can produce competitive harm. Although the FCC did not remove new services from price cap regulation altogether, petitioners contend incumbent LECs may nonetheless incorporate a new service into the price caps at an inflated monopolistic price, thereby inflating the overall price cap and enabling LECs to raise the prices of other services. The FCC also rejected this contention, noting that price caps are determined on a revenue-weighted basis. Therefore, should an LEC offer a new service at an inflated price, it would have little revenue weight so it would not enable the LEC to inflate the rates for other services.

## C. Rate Deaveraging for Transport Basket Services

 As part of the *Pricing Flexibility Order*, the FCC gave LECs additional flexibility to deaverage rates for transport basket services, subject to certain limitations, because averaged rates have the potential to "create a pricing umbrella for competitors that would deprive customers of the benefits of more vigorous competition." *Order* ¶ 60. The FCC believes that deaveraged rates promote efficiency, and existing regulations discouraged carriers from pursuing deaveraged rates. Petitioners challenge this decision on the grounds

that allowing rate deaveraging will result in "predatory pricing and cross-subsidization." In particular, petitioners contend that LECs will use this new pricing flexibility to lower their transport rates in competitive markets and increase their rates where competition is minimal.

Merely because WorldCom disagrees with the FCC's conclusion that deaveraging rates will produce more consumer benefits than maintaining the existing regulatory structure is no reason for this court to strike down the FCC's decision. As noted above, the FCC's policy judgments are entitled to due deference from this court so long as the agency's conclusions are reasonable and supported by substantial evidence, and the agency complies with the applicable procedural requirements. As above, the FCC's decision with regard to deaveraging rates meets this minimal test.

Petitioners' concerns were raised by both AT&T and WorldCom during the notice and comment period, were considered by the FCC, and rejected. The FCC concluded that petitioners' fears are exaggerated, and there is no basis upon which this court could conclude that this determination was arbitrary, capricious or otherwise contrary to law. Indeed, "there is a consensus among commentators that predatory pricing schemes are rarely tried, and even more rarely successful." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 589, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Moreover, the FCC took specific steps to guard against the possibility of anticompetitive conduct. In particular, the *Order* limits annual price increases within pricing zones to fifteen percent, and the annual increases in the study area are limited to five percent. *See Order* ¶ 63; 47 C.F.R. § 61.47(e). According to the Commission, this safeguard ensures "that incumbent LECs cannot define zones that are, for all practical purposes, specific to particular customers." *Order* ¶ 62. Finally, LECs can still be subject to prosecution should they engage in predatory behavior. After thorough review, the FCC consid-

ered these safeguards to be sufficient in this instance, and we can find no reason to upset that result.

### III. Conclusion

For the foregoing reasons, we affirm the FCC, and the petitions for review are denied.