# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 1, 2021　　　　Decided May 27, 2022

No. 20-1471

INTELIQUENT, INC.,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

On Petition for Review of an Order
of the Federal Communications Commission

*Kevin King* argued the cause for petitioner. With him on
the briefs were *Thomas Parisi, Nicole Antoine,* and *Ethan A.
Sachs.*

*Philip J. Macres* was on the brief for *amici curiae* Intrado
Communications, LLC, et al. in support of petitioner.

*Sarah E. Citrin*, Counsel, Federal Communications
Commission, argued the cause for respondents. With her on
the brief were *Robert B. Nicholson* and *Patrick M. Kuhlmann*,
Attorneys, U.S. Department of Justice, and *Jacob M. Lewis,*
Associate　General　Counsel,　Federal　Communications

Commission. *Richard K. Welch*, Deputy Associate General Counsel, entered an appearance.

*Kevin D. Horvitz* argued the cause for *amicus curiae* USTelecom - The Broadband Association. With him on the brief was *Scott H. Angstreich.*

Before: PILLARD and RAO, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

GINSBURG, *Senior Circuit Judge*: Inteliquent, Inc. challenges the Federal Communication Commission's rate cap on the provision of tandem switch services, which are links in the routing chain for toll-free telephone calls placed from a landline. To reduce the incentives for regulatory arbitrage and to encourage companies to transition to lower-cost Internet Protocol technologies, the FCC set a transitional tariffed rate cap of $0.001 per minute for tandem switch services. Inteliquent argues the Commission: (1) ignored its evidence supporting a rate cap of $0.0017 per minute, (2) impermissibly delegated its rate cap decision to USTelecom, a trade association, and/or (3) set the rate cap below Inteliquent's or other providers' costs. For the reasons explained below, we deny Inteliquent's petition for review.

## I.  Background

Toll-free, or 8YY, calls are a type of call for which the recipient rather than the caller pays. When a caller dials an 8YY number, his or her carrier typically queries a nationwide database to determine the owner of that 8YY number. Toll-free callers using a landline operating within a "time-division multiplexing" (TDM) network — a legacy method of

transmitting telephone signals — have their calls routed through a service switching point, also known as a tandem switch. Even if the network does not use a TDM, routing a toll-free call made from a landline is at least a three-step process: (1) the caller's local telephone company, or local exchange carrier, picks up the signal; (2) which it routes to a tandem switch or intermediate switch provider; (3) which then routes the call to the interexchange carrier (IXC) providing service to the owner of the toll-free number. Tariffs for toll-free calls run in reverse of the signal, as depicted below:



This process applies only to landlines; wireless call routing is different because the Commission's rules prohibit wireless providers from paying providers of tandem switching.

In the order under review (the Order), the FCC set a rate cap on tandem switching services, a common alternative for setting a rate in the regulation of telecommunications. Prior to 1990, the largest local exchange carriers were regulated under a "cost-plus" system of regulations, in which the rates they could charge were based on their costs plus a return on their invested capital. That approach changed in 1990 when the Commission adopted an order that created "an incentive-based system of regulation" in order to "reward companies that become more productive and efficient, while ensuring that productivity and efficiency gains are shared with ratepayers."

*See In the Matter of Policy and Rules Concerning Rates for Dominant Carriers*, 5 FCC Rcd. 6786, 6787, ¶ 1 (1990). The 1990 order modified the tariff review process for incumbent Local Exchange Carriers — those that were once local monopolies — by capping their rates and dropping the cap each year to encourage them to improve productivity in order to continue to profit. *Id.* at ¶ 2. Since then, the FCC has used rate caps in other contexts, including the Order Inteliquent challenges here. *See, e.g.*, *In re: Core Communications, Inc.*, 455 F.3d 267, 273 (D.C. Cir. 2006) (discussing rate caps on carrier charges for delivering a call to an internet service provider); *In the Matter of Rules for Interstate Inmate Calling Services, Third Report and Order, Order On Reconsideration, and Fifth Further Notice Of Proposed Rulemaking*, WC Docket No. 12-375, FCC 21-60, at *2 (May 24, 2021) (setting rate cap for interstate and international calls placed from prisons).

As part of its push to improve telecommunications practices, the FCC in 2011 reformed intercarrier compensation for toll calls. *See In the Matter of Connect America Fund*, 26 FCC Rcd. 17663 (2011). In that order, the Commission adopted a presumption that pricing should move to a "bill-and-keep" model, in which a carrier bills only its own retail customers instead of billing other carriers in the path of a phone signal in order to cover its costs. That order did not apply to toll-free calls, in part because the companies providing tandem switching services for toll-free calls must receive payment from either the interexchange carrier or the local exchange carrier. In the Order under review here, however, the FCC transitioned "end office charges" for toll-free calls — that is, charges local carriers bill to IXCs for connecting their users to the IXC's users — to a bill-and-keep model over three years, beginning in July 2021. Because tandem switch providers have

no retail customers to bill, the Commission did not transition tandem switching tariffs to bill-and-keep.

After the FCC transitioned the toll market to the bill-and-keep model, the toll-free calling industry was beset by arbitrage schemes. These schemes take several forms, but we need explicate only one of them, "traffic pumping," to illustrate the flaws in Inteliquent's petition. In that scheme, a tandem switch, local telephone operator, or bulk termination service provider — any firm that purchases and routes 8YY traffic — has a high enough price/cost margin to make it profitable for it to pay others to place robocalls to toll-free numbers and route those calls over its facilities. The design of the scheme is depicted below:



The arbitrageur — the LEC in the figure above — profits from the tariff fee for switching, minus the cost of providing the switching service and the cost of paying a robocaller to place the calls. This is possible, in part, because the competitive intermediate switch carriers' tariffs are not based upon their costs; instead, they are capped at the rates charged by the incumbent LEC, *see* 47 C.F.R. § 51.911(c). The perversity of the arbitrage is compounded because the caller, even if it is a robocaller, does not pay for the toll-free call and therefore has no incentive to select the provider with the lowest rates.

In combination, these conditions create a market distortion because LECs originating toll-free calls not only lack the incentive to minimize intercarrier compensation and tandem switching charges, they also have an incentive to inflate those charges fraudulently through robocalling. As a result, arbitrage and this sort of fraud was widespread and increasing; indeed, AT&T submitted a study during the notice and comment period for the Order showing that 83% of all originating toll-free traffic in 2019 was part of such a scheme. These schemes cause system disruptions, congest incoming lines, and thereby impair carriers' ability to complete legitimate calls. They also burden the owners of the toll-free number with sorting real calls from the many robocalls.

To combat these schemes, the FCC in 2020 adopted the Order, aimed at making arbitrage unprofitable by bringing the price of switching toll-free calls to a point closer to the providers' costs. Because arbitrageurs rely upon a high per-call profit margin in order to compensate robocallers, a low enough rate cap would minimize the incentive to arbitrage. Although setting the rate cap low enough to discourage arbitrage without putting providers out of business seems simple in principle, the Commission's job was made more difficult because none of the commentors on its proposed order submitted data on its costs. Consequently, the FCC was left to discern as best it could, without information about a key component of the equation — providers' costs — the rate cap that would discourage LECs or tandem switchers from encouraging, or engaging in, arbitrage. Lacking that information, the Commission decided to adopt the lower of two rate caps proposed by commenters; USTelecom, a nationwide trade association, proposed a cap of $0.001 per minute based upon a midpoint rate calculated from data provided by its largest members. Inteliquent proposed a cap almost twice as high, to wit $0.0017 per minute. Unlike Inteliquent, which is a

single, independent tandem switch provider, USTelecom represents a large number and a wide range of market participants — including LECs, IXCs, and tandem switching providers. Because USTelecom's footprint is so broad, and its members overwhelmingly supported its proposed cap, the FCC concluded USTelecom's suggested cap of $0.001 was reasonable and would not set prices below providers' costs.

Inteliquent and other tandem switch providers, including *amici* Peerless Network, Inc. and Intrado Communications, LLC objected. They argued that a rate cap of $0.0017 per minute, based upon a weighted national average of Inteliquent's own rates, would better ensure rates were not capped below providers' costs.

## II.      Standard of Review

The parties devote a lot of attention to the degree of deference we should accord the Commission's Order but their dispute is not material to the outcome here.[1] The Administrative Procedure Act "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). "Judicial review under that standard is deferential, and a court may not

---

[1] The FCC claims we owe the Order greater deference because it is a transitional or interim order. *See AT&T, Inc. v. FCC*, 886 F.3d 1236, 1249-53 (D.C. Cir. 2018) (discussing deference to a rate that did not reach the Commission's ultimate goal of universal broadband access); *see also Competitive Telecommunications Association (CTA) v. FCC*, 87 F.3d 522, 531 (D.C. Cir. 1996). Inteliquent counters that the Commission's interim rate does not change the degree of deference we afford the agency because, as we also said in *CTA*, "[E]ven an interim rule expected to be in place for only a brief time is subject to review, or agencies would be free to act unreasonably for that time." *Id.*

substitute its own policy judgment for that of the agency." *Id.* "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.* Because the Order is "reasonable and reasonably explained" we need not determine whether additional deference to the Commission is warranted. *See id.*

The Administrative Procedure Act requires that we "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 706(2) & (2)(A). Prior to adopting any regulation, the FCC must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Manufacturers Association of U.S., Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983) (cleaned up). Here this means the Commission "cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation." *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018).

## III.    Merits

The FCC adopted the rate cap on tandem switching services to discourage arbitrage in toll-free calling and encourage adoption of lower-cost technologies. Although Inteliquent does not dispute these rationales, it argues that the Commission acted arbitrarily and capriciously in setting the rate cap for tandem switching at $0.001 per-minute for three reasons: (1) the FCC ignored the data Inteliquent submitted showing its weighted national average rates; (2) the Commission should not have relied upon USTelecom's proposal as much as it did; and (3) the FCC needed to show the

cap was above providers' costs. We first discuss the Commission's justifications for the rate cap, then turn to Inteliquent's arguments against it.

## A. Arbitrage and Lower-cost Technology

Inteliquent concedes that the rate cap reduces arbitrage and encourages adoption of lower-cost Internet Protocol technologies, the very points the FCC says justify the rate cap. Inteliquent, however, claims the Commission's "decision is [] unreasonable because it fails to take [providers'] cost into account."

The agency should consider any reasonable cost information in the record but may then balance policy considerations beyond costs in setting a rate. *See CTA*, 87 F.3d at 529 (citing *National Association of Regulatory Utility Commissioners v. FCC*, 737 F.2d 1095, 1137 (D.C. Cir. 1984)) ("The FCC is not required to establish purely cost-based rates."). Here the Commission considered but declined to rely upon the outdated and unrepresentative cost information Inteliquent submitted in favor of using a reasonable proxy for costs, namely, the proposal made by USTelecom. The Commission's decision to set the rate cap at $0.001 per minute, then, was reasonable if the record supports its determination that a lower rate cap would better deter arbitrage or encourage a shift to lower-cost technologies and was reasonably calculated to avoid setting the cap below providers' costs. *See National Rural Telecommunications Ass'n v. FCC*, 988 F.2d 174, 178 (D.C. Cir. 1993). Inteliquent says the Commission's explanation of its choice merely states the obvious, namely, that a lower rate "seemed better calibrated to deter arbitrage."

Inteliquent is correct in saying the Commission's rationale is simple but the company ignores that, in its effort to deter

arbitrage, the FCC wanted to adopt not just the lowest rate cap but the lowest rate cap above providers' costs. The Commission's explanation for choosing the lower of the two proposed rate caps to deter arbitrage need not be more complicated than that because the incentive structure for carriers to engage in arbitrage is not more complicated. Put simply, a lower profit margin allows less room to redirect profits to robocallers in exchange for generating phony toll-free calls. The FCC's Order made clear the connection between arbitrage and its decision to select a lower rate cap, quoting a submission from Verizon: "[A]s long as 8YY tandem-switched transport rates remain high . . . there will be strong incentives for carriers to engage in such arbitrage schemes." *In the Matter of 8YY Access Charge Reform* (*"8YY Reform"*), WC Docket No. 18-156, 2020 WL 6055137, at *17 (Oct. 9, 2020). Therefore, the record supports the Commission's anti-arbitrage rationale for selecting USTelecom's lower rate cap submission over Inteliquent's nearly 70% higher submission. Further, Inteliquent does not challenge the Commission's finding that a higher rate cap "could retard the transition to [Internet-Protocol-based] networks." *Id.* at *20. It follows that the record supports the Commission's decision to set a rate cap on tandem switching services as low as possible — though preferably above providers' costs — in order to deter arbitrage and encourage transition to lower-cost technologies.

## B. Inteliquent's Data

We now turn to Inteliquent's arguments against the reasonableness of the rate cap. First, Inteliquent claims the FCC ignored the company's data and failed to explain its reason for doing so. In fact, however, the Commission acknowledged Inteliquent's submission and pointed out flaws that undermined the utility of the study Inteliquent submitted. First, the study was based upon rates Inteliquent charged but

did not include rates charged by any other carrier; therefore, it did not demonstrate that Inteliquent's rates were representative of tandem switch service providers generally. Second, the study produced a weighted national average of rates rather than a weighted national average of costs, which provided the FCC little if any assistance in setting a rate cap above providers' costs. Although Inteliquent argues those rates reflected costs at one time, the Commission responds, correctly, that the incumbent providers' rates Inteliquent relies upon have not been exclusively cost-based since 1990: "those cost studies are almost three decades old and, given the generally declining costs of providing telecommunications service . . . almost certainly overstate carriers' current costs." In short, the FCC did not ignore Inteliquent's submission; the Commission considered Inteliquent's data and reasonably explained its decision not to rely upon it.

Citing *Radio-Television News Directors Association v. FCC*, 184 F.3d 872, 887 n.20 (D.C. Cir. 1999), Inteliquent next argues that even if its data were old and possibly flawed, the FCC could not disregard them because it had no more recent or more credible data to support its rate decision. It is true the Commission may not disregard relevant evidence, but here Inteliquent's evidence was not relevant to the agency's goals of reducing arbitrage and encouraging the adoption of lower cost technology. Indeed, *Radio-Television* supports this conclusion because the study we there faulted the FCC for ignoring directly laid out the potential costs of the challenged rule. *See id*. Here, by contrast, Inteliquent's study was not nearly so relevant; instead, as the Commission pointed out, being old and outdated, it was only weakly related to the current costs of providing tandem switch services.

Most important, Inteliquent never suggested how its rate data could be used to calculate costs, even old costs; instead, it

argues in its reply brief for the first time that the Commission could have used some unspecified means to calculate providers' costs from the rate data it submitted and then used that information to adjust USTelecom's proposed rate cap. The FCC was not required to make a complicated, perhaps impossible, adjustment to USTelecom's proposal. Instead, the Commission was required only to explain why Inteliquent's submission did not bear upon the problems the Order sought to address, which is what it did.

Inteliquent next argues the FCC may not dismiss as dated a study aggregating and weighting the "*current* rates for tandem services" because they are still the lawful rates and presumably, therefore, still just and reasonable. But the FCC did not approve the prior benchmark rates because they were the uniquely reasonable rates; the Commission approved them because it found those rates were within the zone of reasonable rates. *See WorldCom, Inc. v. FCC*, 238 F.3d 449, 462 (D.C. Cir. 2001) ("The relevant question is 'whether the agency's numbers are within a "zone of reasonableness," not whether its numbers are precisely right.'" (quoting *Hercules Inc. v. EPA*, 598 F.2d 91, 107-08 (D.C. Cir. 1978))). That does not mean a lower rate could not also be within the zone of reasonableness. Put another way, Inteliquent's argument would be a reason to reject the Commission's rate cap only if the FCC had previously determined each rate in Inteliquent's study was the lowest just and reasonable rate. Because Inteliquent has made no such showing, its arguments about its data submission do not show the Commission's rate cap is arbitrary and capricious.

## C. USTelecom's Proposal

Inteliquent next argues the Commission arbitrarily adopted USTelecom's proposed rate cap despite its lack of cost justification. Inteliquent's argument assumes the FCC must

adopt cost-based rates, which we have already seen is not correct.  *See CTA*, 87 F.3d at 532, *supra* p. 9.  The same is true of the rates Inteliquent cited in its own data as "cost-based"; those were benchmark rates, drawn from the tariffs of incumbent local service providers, and did not reflect the costs of those incumbent carriers.  As noted previously, the Commission abandoned cost-based ratemaking for its current rate cap approach so that firms would have the incentive to lower their costs in order to increase their profits, which was also one of its reasons for capping rates for tandem switching. Finally, even if the FCC needed some evidence the rate cap was above providers' costs, it reasonably relied upon evidence that many carriers already provided service at or below $0.001 per minute, and upon the overwhelming support of the numerous and diverse members of USTelecom.

Inteliquent next argues the FCC, in accepting USTelecom's proffered rate, failed to exercise its independent judgment.  It is true the Commission may neither rely upon a commenter's proposal without analyzing the support for that proposal, *see City of New Orleans v. SEC*, 969 F.2d 1163, 1167 (D.C. Cir. 1992), nor delegate its decision-making authority to a private party, *see Texas Office of Public Utility Counsel v. FCC*, 265 F.3d 313, 328 (5th Cir. 2001).  Here, however, the FCC did neither.  In *City of New Orleans v. SEC* we vacated an agency's finding because it relied upon a submission containing "no explanation or underlying support" and did not "ascertain[] the accuracy of the data contained in the study," which taken together suggested the agency did not engage in reasoned decision-making.  *See* 969 F.2d at 1167.  Here, in contrast, the FCC reached its decision by analyzing the various arbitrage studies and comparing the submissions of USTelecom, Inteliquent, and others.  The accuracy of the data upon which the FCC relied was not questioned; indeed, Inteliquent never argues USTelecom's members were not

willing to accept $0.001 per minute as the rate cap — and therefore that the information USTelecom's members provided through their revealed preference in accepting the proposal was inaccurate. It argues instead that the FCC should not have inferred the members' support for the $0.001 rate cap implies their costs are less than $0.001. Considering, however, that USTelecom's members are for-profit enterprises, we can hardly imagine an inference more reasonable. To have required that the association's proposal be supplemented with cost data from its member firms would have complicated the proceeding to no purpose.

Inteliquent next argues the FCC could not adopt USTelecom's findings because they are not representative of the industry. Specifically, Inteliquent points out the midpoint rate USTelecom proposed was based upon the experience of large carriers only. Inteliquent is correct, but USTelecom members of all sizes nevertheless agreed to the rate, which implies it was above their costs as well. Indeed, the FCC said as much at the outset of the Order, recognizing that "not all carriers have endorsed the USTelecom proposal," but it has support of "carriers whose size and business models vary significantly." *8YY Reform*, 2020 WL 6055137, at *8 n.73. In addition, USTelecom adopted its suggested rate of $0.001 per minute with the support of the same incumbent carriers upon which Inteliquent's rate study was based; in other words, Inteliquent's rate data are no more representative of the industry as a whole. *Id.*

Inteliquent next criticizes the Commission's reliance upon the support of Bandwidth Technologies, another commenter, for the $0.001 rate cap on the ground that Bandwidth does not provide independent tandem switch services. As an initial matter, the petitioner overstates the Commission's reliance upon Bandwidth's support; the FCC pointed to Bandwidth's

assent to the rate cap merely to point out that not only USTelecom's members supported its proposal. More fundamental, Inteliquent's assertion that Bandwidth does not provide the same kind of services as Inteliquent is not correct; it does, but it uses a lower-cost, internet-based technology. In any event, Inteliquent's argument that its own legacy technology deserves special cost consideration conflicts with the Commission's stated purpose of encouraging adoption of lower cost technologies; we cannot substitute Inteliquent's preferred policy of maintaining old technology for the Commission's contrary policy.

In sum, the FCC did not delegate its decision-making to USTelecom. Nor did the FCC improperly rely upon USTelecom's proposal despite the lack of explicit cost data supporting the proposal.

### D. Cost-justification of the Rate Cap

Inteliquent and the *amici* argue broadly that the rate cap the FCC has adopted is below some tandem switch providers' costs and therefore unreasonable. It is true, as Inteliquent notes, that the FCC may not ignore "costs that the Commission acknowledges to be legitimate," *Global Tel*Link v. FCC*, 866 F.3d 397, 413 (D.C. Cir. 2017), but as discussed above, other considerations may justify its departure from cost-based rates, *see CTA*, 87 F.3d at 532. Next, as the FCC and USTelecom point out, Inteliquent never provided evidence that the rate cap is below its costs, nor does it claim that now. Instead, it argues the rate cap is below its current weighted national average *rate*, but it produced no authority suggesting it is entitled to that rate. Therefore, it was reasonable for the Commission to conclude that Inteliquent's data did not prove it needed to continue charging its current rates to remain profitable.

Inteliquent then argues that the agreement of USTelecom's membership to a $0.001 per minute rate cap does not demonstrate that the rate is above-cost because its members may cross-subsidize by shifting costs to "tandem connection charges." Although that is possible, there is no record evidence that USTelecom's members will cross-subsidize tandem switch services capped at $0.001. In addition, the FCC points out that the independent tandem switch providers among USTelecom's members, which could not cross-subsidize, nonetheless agreed to the rate cap.

Finally, Inteliquent argues the rate cap is below-cost for some rural carriers, pointing to a letter in the record that so asserts. As the Commission points out, however, the letter does not contain any supporting data and Inteliquent made no effort to reconcile the letter with the support of USTelecom's rural members. Finally, even if Inteliquent is correct that the rate is below cost for a small number of providers, Inteliquent cites no precedent, and we are aware of none, requiring the FCC to set a rate cap above the costs of the highest cost provider.

## IV.    Conclusion

Inteliquent's petition rests upon weak data and an outdated approach to price regulation. Incentive-based regulation need not accommodate the high-cost practices of every regulated firm, particularly when exigent circumstances, in this instance widespread arbitrage, provide the impetus for the agency's order. Further, Inteliquent's submission did not show the Commission's rate cap was below cost for itself or for any other provider.

The FCC Order setting the rate cap for tandem switching services at $0.001 per minute was not arbitrary and capricious; therefore, the petition for review is

17

*Denied.*